(612 P.2d 184)
No. 51,757

KANSAS GAS AND ELECTRIC COMPANY, A Corporation, *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS: R. C. LOUX, WILLIAM G. GRAY, AND JANE T. ROY AS THE CONSTITUENT MEMBERS OF THE STATE CORPORATION COMMISSION, *Appellees.*

Opinion filed June 6, 1980.

*Ralph Foster,* of Wichita, for appellant.

*A. Rodman Johnson,* assistant general counsel, for appellees.

Before FOTH, C.J., REES and SPENCER, JJ.

REES, J.: This is an appeal from an order of the Kansas Corporation Commission (KCC) granting to the appellant, Kansas Gas and Electric Company (KG&E), a permanent rate increase less than that sought by KG&E.

KG&E filed a permanent rate increase application December 20, 1978. The request was largely founded upon increased costs attributable to placement in service of Jeffrey Energy Center Unit No. 1 (Jeffrey I), one unit of a multi-unit electric generating facility, on July 30, 1978. KG&E is a 20% owner of Jeffrey I.

Also on December 20, 1978, KG&E filed with the KCC an application for an emergency order authorizing an interim rate increase pending determination of the permanent rate increase application. The interim rate increase request was denied by the KCC on June 8, 1979; rehearing and judicial review were subsequently denied.

As amended at the hearing before the KCC, the permanent rate increase sought by KG&E was for additional annual revenue of approximately 36.4 million dollars. The order before us for review granted a permanent rate increase of approximately 17.3 million dollars annual revenue. It was entered September 24, 1979, and rehearing was denied.

Except for an issue addressed later in this opinion, distillation of the arguments and contentions presented reveals the complaint

of KG&E is that the KCC order is unreasonable because it fails to allow for attrition. The term "attrition" is first used here as a name for a fiscal consequence of regulatory lag. It perhaps is better understood by recitation of events than by attempted definitional statement.

When KG&E's permanent rate increase application was filed, Jeffrey I was in service; KG&E's Jeffrey I cost investment was a properly includable element or part of KG&E's rate base. The permanent rate increase order included KG&E's Jeffrey I cost investment in the rate base. KG&E has collected revenues based upon its Jeffrey I cost investment only after entry of the KCC rate increase order. During the nine-month period of regulatory lag, December 20, 1978, to September 24, 1979, KG&E was not authorized to and did not collect revenues computed by application of a rate of return to KG&E's Jeffrey I cost investment. This "loss" of revenue is irretrievable by KG&E; a rate increase order operates prospectively. The principle demonstrated is that where new plant is devoted to use, a utility realizes no revenue attributable to the new plant cost investment until collection of revenue is authorized by a KCC order that includes the new plant cost investment in the rate base. KG&E labels as "attrition" the "loss" of revenue which would have been collectible had Jeffrey I been included in KG&E's rate base during the regulatory lag period; this attrition exists whether the amount of such revenue loss is measured by use of a new or the then existing authorized overall rate of return as the multiplier.

Retrospective view can disclose with some accuracy the loss to a utility attributable to operating costs incident to new plant not included as part of the rate base during regulatory lag. Although not capable of both simple and accurate ascertainment, one must recognize that the effects of inflationary times aggravate the fiscal impact upon a utility of regulatory lag.

KG&E sought to alleviate its asserted fiscal deficiency attributable to regulatory lag by requesting interim rate relief. It might be said KG&E now seeks relief it failed to obtain when its interim rate increase application was denied and its present claim before us is in the nature of a second appeal from the KCC decision to deny interim rate relief. However, KG&E's present argument should not be rejected on an improper second appeal theory. KG&E has sought to keep the regulatory lag attrition question alive at least by appellate effort.

In addition to denomination of attrition as revenue loss sustained prior to entry of a rate increase order, KG&E points to its historical failure to realize its authorized rate of return. Specifically, KG&E points out that since 1974 its actual rate of return on common equity has consistently been less than the rate of return on common equity authorized, *i.e.,* found reasonable. This deficiency is also referred to as attrition by KG&E. It is contended the order under review improperly fails to allow for this attrition.

The record discloses that in support of its application, KG&E presented opinion testimony that 15 percent to 17 percent represents a reasonable rate of return on its common equity, cost of equity capital. Evidence presented by KCC staff placed a reasonable rate of return on KG&E's common equity at 13.93 percent to 14.29 percent and authorization of 14.11 percent was recommended. Thus, under the evidence and testimony presented, the range was from 13.93 percent to 17 percent. The rate adopted by the order is 13.93 percent. KG&E argues this constitutes unreasonable action by the KCC, particularly in the light of the historically demonstrated attrition. It further argues the negative consequences to be anticipated will be aggravated by inflation. At oral argument, counsel for the KCC conceded that on the record presented allowance of a rate of return on common equity less than 13.93 percent would have been unreasonable.

We need not yet again recite the principles and rules applicable to our review. They were summarized in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-381, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979).

Examination of the record satisfies us that in this rate proceeding the KCC undertook to keep the rates to KG&E customers low. The approach of the KCC to the rate of return on common equity may fairly be described as most conservative if not stingy in the extreme. The question, however, is whether the permanent rate increase order was reasonable; no contention is made that the order is unlawful. KG&E argues the order is not reasonable for the reason that the order of the KCC fails to take attrition into account.

The order discloses the KCC addressed the issue of attrition. This is reflected in its discussion of rate of return on common equity. Reflecting the KCC's consideration of the issue are the following statements found in the order:

"The Commission is not unmindful of the applicant's construction require-ments, and the resultant adverse financial impact on applicant. We are also not unmindful of the impact of decisions in rate proceedings on the availability and cost of future financing. We are, however, mindful that allowed rate of return is hardly a determining factor in the securing of future financing. . . . It is not this Commission alone that assures confidence in the financial soundness of the utility, and it certainly is not this Commission that deters applicant from earning the return authorized to it. We do recognize the adverse impact of regulatory lag on utility earnings, and are determined to reduce the elapsed time between filing of rate applications and their determination. We further note that the return herein granted represents an increase from the 13.50 per cent return on common equity found to be reasonable in its last rate proceeding . . . which was determined June 8, 1978. Among other considerations in determining a fair rate of return to rate base in the instant matter, we considered: 1) pro forma adjustments to rate base, revenues and operating expenses; 2) management's policies toward admin-istrative expenses; 3) the type of utility, the urgency and extent of its need for additional capital and the sources from which it obtains funds for such purposes; 4) the capital structure of the utility, and the effect of its components on revenues requirements of it; 5) the imbedded cost of its outstanding debt and the maturity dates thereof; and 6) whether the amount of the return will be sufficient to cover the annual interest and for dividend on the senior investor capital to permit the utility to pay reasonable dividends to the common stock holders. We further take into consideration the territory served by applicant, the general economic condi-tions prevailing therein . . . . This Commission is interested in efficient, and sufficient electric service to the applicant's customers at rates that are fair and reasonable, both to the customers and to applicant's stockholders."

In its brief and argument, KG&E suggests five approaches to alleviation of a utility's problems resultant from attrition: (1) a projected, or budgeted, test year; (2) an historic test year with a year-end rate base and pro forma adjustments with increased rates effective at or very near the end of the test year; (3) a replacement cost rate base; (4) an aggressive, promotional approach to "mar-keting" energy; and (5) an attrition allowance. With respect to these five alternatives, we find (1) the application was not pre-sented on the basis of a projected test year but rather on the basis of an historic test year ending August 31, 1978, one month after placement of Jeffrey I in service, (2) the application was pre-sented and considered on the basis of an historic test year with a year-end rate base and pro forma adjustments, (3) KG&E dis-claims suggestion that replacement cost rate base should be used in setting rates, (4) KG&E concedes that in present times conser-vation of energy is a proper concern which negates the propriety of sales promotions, and (5) a specific "attrition allowance" is not

found to have been suggested by KG&E before the KCC or before us on appeal.

In further regard to the second suggested alternative, all recognize our rate-making procedure is such that rates are set prospectively. KG&E's efforts to have its increased rates effective soon after the end of the historic test year by entry of an interim rate increase order has previously been rejected. That particular action on the part of the KCC is not now again before us.

In regard to the fifth suggested alternative, we also find that KG&E's arguments on appeal cannot be characterized as assertion it was unreasonably denied a specific attrition allowance but rather its position is that the fiscal consequence of lag time and historically demonstrated failure to realize its allowed rate of return on common equity render the rate increase allowed by the order from which this appeal is taken unreasonable. The KCC has expressed its awareness of this problem, a problem confronting all utilities subject to the regulatory jurisdiction of the KCC; alleviation must be by action and cooperation of the KCC and Kansas utilities.

Although not material to our decision, it is observed that five months of lag in this case results from deferral by KG&E of the filing of application for increased rates from August 31, 1978, to December 28, 1978; nine months of lag is regulatory.

The second issue raised on appeal is a claim the KCC erroneously excluded from the rate base approximately 1.5 million dollars attributable to certain coal handling facilities constructed as a part of and to accommodate the needs of all units of the Jeffrey Energy Center. KG&E presented evidence of actual and needed use of these facilities in the operation of Jeffrey I, the first unit placed in service. The KCC concluded the facilities were excess and not required to be used in the operation of Jeffrey I. Actual use of the facilities must be acknowledged even though the KCC describes the evidence of KG&E as not of substance.

We have previously spoken of the disjunctive "used or required to be used" standard to be applied in determination of rate base. See *Kansas-Nebraska Natural Gas Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 674, 677, 610 P.2d 121 (1980); K.S.A. 1979 Supp. 66-128. *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, 544 P.2d 1396 (1976), lends support to KG&E's contention of erroneous exclusion of the coal

handling facilities from its rate base. The KCC responds with a factual argument of reasonableness. We choose to not undertake resolution of the issue. It is our conclusion that if there was error of 1.5 million dollars on a rate base of approximately 521.9 million dollars with respect to which there has been authorized an overall rate of return of 9.36 percent, the error is not of sufficient impact and importance to justify setting aside the order and the attendant consequences of such action on our part.

We conclude that although the authorized rate of return on common equity granted by the KCC was at the very limit of reasonableness, neither it nor the overall rate of return authorized were so wide of the mark as to be outside the realm of fair debate. See *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, 569-570, 527 P.2d 1065 (1974); *Vulcan Materials Co. v. Kansas Corporation Commission,* 3 Kan. App. 2d 643, 647, 600 P.2d 145, *rev. denied* 227 Kan. 928 (1979). We find the challenged rate order, supported by substantial competent evidence, reasonable. Being reasonable, the order is not confiscatory. *Kansas-Nebraska Natural Gas Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d at 675.

Affirmed.