(619 P.2d 329)
No. 80-52472-A

THE KANSAS POWER & LIGHT COMPANY, *Appellant,* v. THE STATE CORPORATION COMMISSION OF THE STATE OF KANSAS, RICHARD C. LOUX, Chairman, JANE T. ROY and WILLIAM G. GRAY, Commissioners, and their respective successors in office as members of the State Corporation Commission of the State of Kansas, *Appellees.*

Petition for review denied January 23, 1981.

Opinion filed November 18, 1980.

*John K. Rosenberg,* Assistant General Counsel, KP&L, of Topeka, and *James W. Grimes, Jr.,* of Cosgrove, Webb and Oman, of Topeka, for appellant.

*Curtis M. Irby,* Assistant General Counsel, and *Brian J. Moline,* General Counsel, Kansas Corporation Commission, for appellee.

Before ABBOTT, P.J., REES and MEYER, JJ.

MEYER, J.: On November 16, 1979, the Kansas Power and Light Company (KP&L) filed an application with the State Corporation Commission (KCC) for permission to put into effect rates which would increase the gross revenues of its natural gas operations by $4,405,757.00. This was based on a test year ending August 31, 1979. KP&L requested a rate base of $47,785,452.00 and an 8.53 percent rate of return producing a revenue requirement of $4,076,099.00. Test year operating income was reported at

$2,171,208.00, leaving a shortfall of $1,904,891.00. This was increased by an income tax requirement of $1,878,032.00 and a "cost escalation allowance" of $622,834.00, to produce the requested $4,405,757.00.

By order of June 2, 1980, the KCC, following various hearings on the application, granted $2,903,332.00 of the request. This was based on a $45,342,264.00 rate base to which an 8.48 percent rate of return was applied. The product of multiplication of these two figures is $3,845,024.00. The test year operating income was found to be $2,383,051.00, leaving a shortfall of $1,461,973.00. Adjusting this figure for income tax, KCC found that additional revenue income of $2,903,332.00 was necessary to provide the authorized return.

Only four matters are presented for judicial review. The facts relevant to those issues will be set out with the discussion.

Did the KCC err:

(1)  in failing to adopt KP&L's cost escalation allowance?
(2)  in failing to include certain CWIP in KP&L's rate base?
(3)  in its treatment of the gain on the sale of KP&L's Salina office building?
(4)  in its treatment of deferred taxes?

The standard of review is stated in *Midwest Gas Users Ass'n v. Kansas Corporation Commission,* 3 Kan. App. 2d 376, 380-81, 595 P.2d 735, *rev. denied* 226 Kan. 792 (1979):

"K.S.A. 1978 Supp. 66-118d limits judicial review of an order by the commission to determining whether the order is 'lawful' or 'reasonable.' *Kansas Gas & Electric Co. v. State Corporation Commission,* 218 Kan. 670, Syl. ¶ 1, 544 P.2d 1396 (1976). A court has no power to set aside such an order unless it finds that the commission acted unlawfully or unreasonably. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, 396-7, 565 P.2d 597 (1977). An order is 'lawful' if it is within the statutory authority of the commission, and if the prescribed statutory and procedural rules are followed in making the order. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. 505, Syl. ¶ 1, 561 P.2d 779 (1977). An order is generally considered 'reasonable' if it is based on substantial competent evidence. *Jones v. Kansas Gas and Electric Co.,* 222 Kan. 390, Syl. ¶ 2.

"The legislature has vested the commission with wide discretion and its findings have a presumption of validity on review. *Central Kansas Power Co. v. State Corporation Commission,* 221 Kan. at 511. Since discretionary authority has been delegated to the commission, not to the courts, the power of review does not give the courts authority to substitute their judgment for that of the commission. *Central Kansas Power Co. v. State Corporation Commission,* 206 Kan. 670, 675, 482 P.2d 1 (1971). The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into fixing utility rates. It is aided by a staff of assistants with experience as statisticians,

accountants and engineers, while courts have no comparable facilities for making the necessary determinations. *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 48-9, 386 P.2d 515 (1963). Hence a court may not set aside an order of the commission merely on the ground that it would have arrived at a different conclusion had it been the trier of fact. It is only when the commission's determination is so wide of the mark as to be outside the realm of fair debate that the court may nullify it. *Kansas-Nebraska Natural Gas Co. v. State Corporation Commission,* 217 Kan. 604, 617, 538 P.2d 702 (1975); *Graves Truck Line, Inc. v. State Corporation Commission,* 215 Kan. 565, Syl. ¶ 5, 527 P.2d 1065 (1974)."

Insofar as KP&L's arguments concerning scope of review for constitutional violations attempt to broaden the standards established in *Midwest Gas Users,* the following statement from *Kansas-Nebraska Natural Gas Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 674, 675, 610 P.2d 121, *rev. denied* 228 Kan. 806 (1980), may be added:

"K-N contends that the KCC order is both unlawful and unreasonable. It further argues that the approved rates are confiscatory and violate its constitutional right to due process because they would not produce a reasonable return or just compensation upon the value of its property. K-N's argument relating to confiscation attempts to broaden our scope of review to include an independent judicial judgment on the facts as well as the law.

"The statutory standard of K.S.A. 1979 Supp. 66-118d requiring 'reasonable' utility rates is higher than the constitutional standard for due process. In other words, a rate cannot be confiscatory if it is reasonable. Therefore, even if the scope of review is broader for a due process complaint, a determination that a rate order is reasonable would logically preclude consideration of an allegation of confiscation. In *Power Comm'n v. Hope Gas Co.,* 320 U.S. 591, 88 L.Ed. 333, 64 S.Ct. 281 (1944), the U.S. Supreme Court said, 'If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry . . . is at an end.' *Hope,* 320 U.S. at 602. The Court also said, 'Since there are no constitutional requirements more exacting than the standards of the Act, a rate order which conforms to the latter does not run afoul of the former.' *Hope,* 320 U.S. at 607. Accordingly, our review is limited to the statutory standard of K.S.A. 1979 Supp. 66-118d."

## I.  Did the KCC err in failing to adopt KP&L's cost escalation allowance?

Of the $4,405,757.00 additional revenue requested by KP&L, $622,834.00 represented a "cost escalation allowance" which was computed upon evidence of a 13 percent increase in certain operating expenses over the preceding five years and reduction of the computation to utilize a 6½ percent figure for anticipated future inflation.

There can be no doubt that rates must be set with the future in mind. However, *McCardle v. Indianapolis Co.,* 272 U.S. 400, 71

L.Ed. 316, 47 S.Ct. 144 (1926), cited by KP&L, stands for no more than that rates should provide a reasonable return into the immediate future. KP&L argues that in order to assure a reasonable return its revenue requirements (determined by application of the unchallenged rate of return to its rate base) should be *specifically* adjusted to provide for future inflation.

In *Gas Service Co. v. Kansas Corporation Commission,* 4 Kan. App. 2d 623, 635-36, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980), this court recently quoted with approval the following general statements regarding adjustments outside the test year:

"Although the use of a test year is proper, the Commission, in exercising its legislative function of fixing utility rates for the future, should not be blind to the future. It may adjust the results of the test year by allowing for *known changes* to make the test year representative of the future. . . .' *Commonwealth v. VEPCO,* 211 Va. 758, 771, 180 S.E.2d 675, 89 Pub. U. Rep. 3d 395 (1971) (emphasis added).

" 'Ratemaking, by its very nature, is prospective and in order to neutralize the negative effects of speculation and guesswork about future economic conditions, it is accepted practice to base future rates upon known past and present conditions through the use of data gathered during a specified test period. [Cite omitted.] This process of prognostication creates a conflict between the need to lend some finality to ratemaking by utilizing a well-defined, finite test period and the need to base calculations upon the latest available relevant data which often pertains to time periods other than the test period. [Cite omitted.] A satisfactory resolution of this conflict is that when *known and measurable* post-test-year changes affect with certainty the test-year data, *the commission may, within, its sound* discretion, give effect to those changes. [Cite omitted.]' *Narragansett Elect. Co. v. Harsch,* 117 R.I. 395, 416, 368 A.2d 1194 (1977) (emphasis added)."

In *Southwestern Bell Tel. Co. v. State Corporation Commission,* 192 Kan. 39, 386 P.2d 515 (1963), the court affirmed the Commission's decision not to grant a specific allowance for inflation. The Commission had found that although the utility's costs were increasing, expenses attributable to each telephone unit in service were decreasing and revenues were increasing. The Commission concluded that such offsetting factors were sufficient to absorb the effects of anticipated inflation. In affirming the Commission, the court stated:

"Although rates are made for the future, the allowance of an increase in income in anticipation of further inflation can have a very unwholesome effect on economy." 192 Kan. at 84.

Although *Southwestern Bell* was decided in a different time as

regards inflationary pressures, the Commission's approach there demonstrates that recognition of increasing expenses likely to continue into the future does not require, in itself, a *specific* allowance for that increase. Other factors in the utility's operation may offset, wholly or partially, such increasing costs insofar as they erode the authorized return. The court in *Southwestern Bell* further stated:

"The consideration to be given attrition and anticipated future inflation is a matter to be left largely to the discretion of the State Corporation Commission." 192 Kan. 39, Syl. ¶ 16.

In *Kansas Gas & Electric Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 63, 612 P.2d 184 (1980), this court considered a claim of attrition based on regulatory lag. The court noted that on appeal KG&E suggested five approaches to alleviation of attrition: "(1) a projected, or budgeted, test year; (2) an historic test year with a year-end rate base and pro forma adjustments with increased rates effective at or very near the end of the test year; (3) a replacement cost rate base; (4) an aggressive, promotional approach to 'marketing' energy; and (5) an attrition allowance." 5 Kan. App. 2d at 66.

As to (1), the court found that KG&E failed to adopt the projected test year in its application; (2) an historic test year with year-end rate base and pro forma adjustments was used, although interim relief was denied; (3) a replacement cost rate base was disclaimed; (4) sales promotion was recognized as inappropriate in a time of energy conservation; and (5) KG&E failed to specifically suggest an "attrition" allowance to the commission. Since the rate of return was found reasonable, the court found no error. Contrary to KP&L's assertion, there is no indication that "the only reason for not remanding was the company's failure to provide evidentiary support for a specific adjustment."

The court did note, as to the problem of attrition and regulatory lag:

"The KCC has expressed its awareness of this problem, a problem confronting all utilities subject to the regulatory jurisdiction of the KCC; alleviation must be by action and cooperation of the KCC and Kansas utilities." 5 Kan. App. 2d at 67.

The present case squarely presents the question of a specific attrition-inflation allowance. The matter was clearly presented to the Commission.

Unlike *Southwestern Bell,* the Commission here makes no

claim that KP&L's increased productivity in terms of employees per customer in any way offsets the effects of inflation on the authorized rate of return. The Commission based its decision on the following grounds: (1) an historical test year with pro forma adjustments is the best method of determining rates; (2) of the expenses involved in computing the proposed adjustment (for salaries, materials and supplies), the utility has some control over salaries; (3) "a cost escalation allowance" violates the concept of synchronization of rate base and expenses by allowing expenses from outside the test period; and (4) there would be some double recovery. Further, the Commission found that if the specific adjustment requested had been used in the past years pointed to by KP&L in its evidence of experienced inflation, the rate of return in certain of those years would have been higher than that authorized.

Use of an historical test year with pro forma adjustments in arriving at revenue requirement is acceptable. The rate method employed is generally discretionary with the Commission and KP&L does not advance any other method, *e.g.* a "projected" test year. The nature of the pro forma adjustments to the test year data is not made clear in the Commission's order, nor in the briefs of the parties, but at oral argument it was brought out that these included use of a year-end rate base and annualized expenses. Other jurisdictions have held that use of a year-end rate base, in itself, is sufficient as one of various acceptable responses to the problem of attrition. *New England Tel. & Tel. Co. v. State,* 113 N.H. 92, 302 A.2d 814 (1973); *Maine Water Co. v. Public Util. Commission,* 388 A.2d 493 (Me. 1978); *Conn. Light & Power v. Public Utilities Control,* 176 Conn. 191, 405 A.2d 638 (1978).

As to the Commission's reason (2) which related, in part, to salaries, although it is true that KP&L has some control over salaries, it would be unreasonable to expect the utility to seek to control this aspect of increasing expense by completely curtailing increased salaries for its employees. This reason provides little, if any, additional support for the Commission's decision.

As to (3), the synchronization of rate base and expenses, the Commission's concern is proper, but as set out in *Gas Service,* 4 Kan. App. 2d 623, 635-36, " 'when *known and measurable* post-test-year changes affect with certainty the test-year data,' " they may be given effect. The evidence before the Commission dem-

onstrated that inflation is difficult to fit into this rule. As a counter to KP&L's evidence that its relevant expenses had increased an average of 13 percent per year over a five-year period, staff presented evidence that even applying KP&L's "conservative" 6½ percent adjustment to two of those previous years would have produced revenues in excess of the authorized rate of return. This again demonstrates that apparently quantifiable effects of inflation cannot always be applied prospectively as a simplistic solution to attrition. See the discussion in *Southwestern Bell*, 192 Kan. 39.

The Commission's reason (4) deals with double recovery due to the authorized rate of return. It is of note that KP&L does not address this reasoning. It must be kept in mind that KP&L is seeking a specific adjustment to its gross revenue requirements. Those requirements are determined in a rate case by multiplying the rate base by a rate of return. The rate base is quantifiable based on the value of the property devoted to service. The rate of return is determined in large part by the amount, most commonly expressed in terms of percentages, needed to service the utility's capital.

We do not find abuse of discretion on the part of the Commission in its rejection of KP&L's requested cost escalation allowance.

II. Did the KCC err in failing to include certain CWIP in KP&L's rate base?

KP&L originally requested inclusion in the rate base of six construction projects completed and placed in service after the end of the test year (commonly referred to as "construction work in progress" or CWIP). At the time of the hearing, KP&L itself eliminated two of these projects. Accordingly, only the four remaining projects will be discussed.

Adjustment No. 1 was a buried river crossing of an 8-inch gas transmission line at the Smoky Hill River. The project was necessitated by the dismantling of a bridge to which the line had previously been attached. The cost was $122,940.00 and the line was placed in service on September 25, 1979, only 25 days after the end of the test year. Adjustment No. 2 was also a buried river crossing, this time of a 4-inch gas transmission line at the Arkansas River, again necessitated by the removal of a bridge. The cost was $41,253.00 and the line was placed in service on No-

vember 19, 1979. Adjustments No. 5 and No. 6 reflected installation of anodes to provide cathodic protection. The anodes are corrosion inhibitors for underground transmission lines. The cost was $225,303.00 and $115,115.00 respectively, and they were placed in service in October and December of 1979. These four projects thus totalled $504,611.00 which KP&L sought to have added to its rate base.

KCC witness Elic opposed the adjustments:

"Staff Adjustment No. 1 eliminates from rate base Applicant's proforma adjustments for specific construction projects completed after the end of the test year. Staff opposes inclusion in rate base of any property that is not used or required to be used in providing service to current ratepayers. Staff believes it is critical to synchronize rate base and operations to determine the earning power of Applicant's end of period rate base. Inclusion of these projects in rate base without recognizing the revenue producing or cost saving effect of these projects upon operations produces a mismatch between rate base and operations. . . . Accordingly, this mismatch impairs the ability to determine the earning power of Applicant's end of period rate base. Allowing these projects in rate base without proper synchronization with operations would be extraordinary rate making treatment. For these reasons, Staff believes it is not appropriate for Applicant to include these projects in rate base."

By eliminating the first two projects, KP&L sought to eliminate the staff's objection to inclusion of the other four projects: lack of synchronization of rate base and operations.

At this point we deem it proper to explain what is meant by synchronization as it relates to CWIP. Such synchronization simply means that when the CWIP, once placed in service, lowers the cost of the utility's product or produces revenue, such cost savings or revenue production must be matched with the cost of the CWIP. Inclusion of the CWIP in the rate base without recognizing these cost savings or revenue production results in a lack of synchronization. When such cost savings or revenue production is not taken into account by the utility, the KCC has uniformly denied such CWIP additions.

KP&L sought to show that the four projects had no cost-saving aspects and were non-revenue producing. KP&L's witness Kitchen testified as such as to adjustments No. 1 and No. 2, and KCC's Elic conceded this.

As to adjustments No. 5 and No. 6 (the anodes), while there was evidence which established that same were non-revenue producing, it is also evident that at some future time there will, in fact, be a savings by KP&L. Moreover, KCC noted that KP&L had not

placed into its cost savings that which they derived from previously installed anodes.

The problem of whether CWIP should be included in a utility's rate base has been a continuing one in the cases before this court. In *Gas Service Co.*, 4 Kan. App. 2d at 629-30, the court stated:

"The Commission is authorized to include CWIP that will be completed within one year or less of the test year by virtue of language added in 1978 to what is now K.S.A. 1979 Supp. 66-128, as follows:

" 'For the purposes of this act, property of any public utility which has not been completed and dedicated to commercial service shall not be deemed to be used or required to be used in said public utility's service to the public, except that, any property of a public utility, the construction of which will be completed in one (1) year or less, *may* be deemed to be completed and dedicated to commercial service.' (Emphasis added.)

"As we view the statute, it is not mandatory that the Commission include the cost of CWIP and our Supreme Court so indicated in language found in *Kansas City Power & Light Co. v. KCC*, 224 Kan. 86, 578 P.2d 254 (1978). The question was whether the statute, prior to addition of the portion quoted above, required or precluded inclusion of CWIP in the rate base. The Court held at page 88:

" 'It is the opinion of the court that under the statute, as then constituted, the inclusion or exclusion of CWIP in the rate base was a discretionary function of the Commission to be based upon a factual determination, from the evidence submitted, whether the requested CWIP was "property . . . used or required to be used in its services to the public within the state of Kansas, . . ." (K.S.A. 66-128.) See *Kansas Gas & Electric Co. v. State Corporation Commission*, 218 Kan. 670, 544 P.2d 1396 (1976).'

"The Court then commented on the 1978 addition, stating:

" 'House Bill 2070 attempts to clarify the legislative intent of 66-128 in that it specifically excludes all CWIP from consideration by the Commission except any CWIP which will be completed in one year or less *may* be included by the Commission in its determination of the rate base. The inclusion of CWIP continues to be a discretionary matter for the Commission only to the extent that it will be completed in one year or less.' (at 89.)"

The court's assessment there applies equally to the present case.

"In this case, neither the major nor minor CWIP was completed and in service at the end of the test year, but it was all completed at the time of the rate hearing and within six months after the end of the test year. Thus, by statute, inclusion of the CWIP was discretionary with the Commission, 'based upon a factual determination, from the evidence submitted, whether the requested CWIP was "property . . . used or required to be used in its services to the public within the state of Kansas." ' " 4 Kan. App. 2d at 630.

See also *Kansas-Nebraska Natural Gas Co.*, 4 Kan. App. 2d 674.

Two initial matters should be considered. First, there appears to be no question but that the four projects in issue here are, as a

factual matter, "used or required to be used in its services to the public within the state of Kansas." Second, KP&L argues that the "within one year" requirement of the statute refers to within one year of the KCC's order. Thus, any property completed and placed in service prior to the date of that order, even though outside the test year, is not CWIP at all and therefore required to be included in the rate base. As indicated above, this question was answered in *Gas Service* where we stated that the statute allows inclusion of CWIP which will be completed within one year or less of the test year.

This brings us to the merits of whether the Commission abused its discretion by not including the four projects here. The Commission's reason for rejecting the projects is strained. The staff's strongest argument for exclusion was lack of synchronization with cost savings (decrease in expenses). However, as to two of the four projects (the river crossings) the evidence is clear that since no cost savings are involved, the synchronization problem is not present. In addition, any cost savings with respect to the anodes was unquantifiable at this time and would not be effective for three years. These facts, if standing alone, would hardly justify a denial of inclusion.

Inclusion of CWIP is, however, *discretionary* with the Commission. On appeal, the Commission advances additional considerations which it says enter into its decisions on CWIP. Among these is whether a utility is in financial need of inclusion. This appears to be the type of consideration the Commission should employ in considering whether to exercise its discretion to include or not include CWIP. A policy of so considering, but otherwise generally excluding CWIP, is strict but supportable under our statute. The evidence showed no financial hardship to KP&L or other reason to compel inclusion.

It is necessary that we give consideration to "allowance for funds used during construction" (AFUDC), and particularly the capitalization of AFUDC. Capitalization of accumulated AFUDC occurs when the funds expended in construction, plus interest thereon (AFUDC), are added together on the books after construction is completed and the new project is placed in service. The value of the project appears in future rate bases, not in the amount of the principal sum invested, but as that sum plus interest.

The record is clear that AFUDC was "computed" and capitalized in the present case on the four projects up to the time they went into service. In *Gas Service* this court held that *capitalizing* AFUDC was a recognized alternative to including CWIP in the rate base.

On appeal, the question is not whether we would have handled a matter in the same manner as KCC, but rather it is whether the action of the KCC is so wide of the mark as to be outside the realm of fair debate. The question is a close one, but we feel obliged to hold that KCC did not abuse its discretion.

The KCC's decision as to the second issue is affirmed.

III.   Did the KCC err in its treatment of the gain on the sale of KP&L's Salina office building?

In September, 1979, KP&L sold its office building in Salina for a book gain of $1,359,194.00. KP&L treated this gain as a "below-the-line" item, *i.e.,* outside of its accounts for ratemaking purposes. The staff proposed an adjustment to realize some of this gain for the ratepayers. Staff witness Elic explained the proposed adjustment:

"Staff Adjustment No. 2 is to allocate a portion of the gain realized on the sale of the Salina general office building to the accumulated provision for depreciation. Applicant disposed of its Salina general office building in September 1979 and realized a book gain of $1,359,194. Originally, Applicant recorded the transaction as a normal retirement, i.e. recorded the gain as a reduction of net plant-in-service. However, subsequently Applicant adjusted its recognition of the transaction and reclassified the gain to account 421.10 'gain on disposition of property.' This account is a 'below-the-line' income account and thus the entire gain will inure to the sole benefit of the stockholder. Staff believes ratepayers should share in this gain. While the ratepayers do not have an ownership interest in the utility property of Applicant, they are responsible for compensating Applicant for normal operating expenses, related taxes and a rate of return. Accordingly, equity would dictate that any gain from the disposition of utility property requires recognition to the ratepayers. Staff has determined the gain to ratepayers by reducing the total gain by the undepreciated basis of the property and related income taxes on the transaction. This approach results in stockholders recovering their capital investment in full. The residual amount of $494,523 allocated to the gas department at 42.3% results in Staff's adjustment of $209,183. The net effect of Staff's adjustment is to provide the stockholders a return of their investment in addition to a return on their investment over the length of time the building was in service. The excess is flowed through to ratepayers. It should also be noted that Applicant has made a proforma adjustment to annualize lease payments on space occupied by the divisional office employees displaced by the building sale."

Allocation of $209,183.00 of the gain to accumulated deprecia-

tion "above-the-line" reduces plant-in-service and subsequently the rate base by that amount, thus resulting in a lower revenue requirement. The gain is thus "flowed through" to the ratepayers by means of lower rates.

KCC's witness Elic testified in part as follows:

"Q With reference to the million and three, would you tell me how much of that was allocated to the stockholders and how much was allocated to the customers?

"A Original cost has been returned to the stockholder in addition to the rate of return that automatically flows through over the years to the stockholder.

"Q So he gets his money back plus whatever the rates over the years have given him in return?

"A Right.

"Q And nothing specifically related to the inflation and value of the asset over those years?

"A Again, I guess it goes back to my basic premise that the return encompasses some sort of an inflation element.

"Q So to the extent that gain is the difference between original cost less depreciation and fair market sale price, under your method all of that gain goes to the customer; isn't that correct?

"A Once we have returned the capital investment to the stockholders plus return for the years involved with that particular asset, the residual flows to the ratepayers through our adjustment."

The Commission adopted the staff adjustment.

KP&L objected to the Commission's treatment of the gain on two grounds: (1) deviation from the Federal Energy Regulatory Commission System of Accounts, approved for use by the Commission, and (2) violation of the principle that KP&L, as owner of the property, is entitled to any gain on its sale.

The Commission does not dispute that the FERC (formerly the FPC) system of accounts has been adopted by it and has application here. The Commission also does not dispute that under that system, gains of the type at issue here are credited "below-the-line." The Commission, rather, argues that K.A.R. 82-1-231 which prescribes the system of accounts also provides at subsection (g) that "for a good cause shown the Commission may waive any of the requirements of this rule." From this the Commission contends:

"It therefore appears that the above Section (82-1-231) applies to the entire substance of the handling of rate applications and while the Applicant maintains its books and records in accordance with the Uniform System of Accounts, neither the Applicant nor the Commission is bound to a strict and absolute adherence for rate making purposes."

KP&L contends that the accounting system was "intended as more than a formality subject to variation in a rate case at the Commission's discretion."

Although KP&L's argument for consistency between accounting requirements and ratemaking is appealing, the courts have not generally required it. *Wash. Pub. Interest Org. v. Public Serv. Com'n,* 393 A.2d 71 (D.C. App. 1978), *cert. denied* 444 U.S. 926 (1979), thoroughly discusses the uniform system of accounts and its application to the situation presented here, and holds that regulatory agencies should be free, under special circumstances, to deviate from the Uniform System of Accounts for ratemaking purposes.

We turn then to whether the sale of the Salina office building in this case is such a situation.

KP&L argues that the Commission's treatment of the sale violates the principle that KP&L, as owner of the building, is entitled to the gain on its sale. *Democratic Cent. Com. of D.C. v. Washington M.A.T. Com'n,* 485 F.2d 786 (D.C. Cir. 1973), *cert. denied* 415 U.S. 935 (1974), relied upon by the Commission, applied the principle of "gain follows risk of loss" to the question presented here, rejecting the principle that the utility was *automatically* entitled, as owner, to any gains on the sale of its property. The court first analyzed the decline discussed in *Wash. Pub. Interest Org.,* of the principle of "present fair value" in rate base determinations and the parallel depreciation formulation. For a further discussion of the U.S. Supreme Court's changing philosophy in this regard, see *Southwestern Bell Tel. Co. v. State Corporation Comm'n,* 192 Kan. 39, 54-65. In essence, this "change" is that "present fair value" need no longer be used as a requirement of due process in valuing a utility's property for ratemaking purposes. Instead, only a "reasonable value" for purposes of establishing a fair and reasonable return need be determined. From this change in due process analysis, the court, in *Democratic Cent. Com.* concluded:

"We perceive no impediment, constitutional or otherwise, to recognition of a ratemaking principle enabling ratepayers to benefit from appreciations in value of utility properties accruing while in service. We believe the doctrinal consideration upon which pronouncements to the contrary have primarily rested has lost all present-day vitality. Underlying these pronouncements is a basic legal and economic thesis—sometimes articulated, sometimes implicit—that utility assets,

though dedicated to the public service, remain exclusively the property of the utility's investors, and that growth in value is an inseparable and inviolate incident of that property interest. The precept of private ownership historically pervading our jurisprudence led naturally to such a thesis, and early decisions in the ratemaking field lent some support to it; if still viable, it strengthens the investor's claim. We think, however, after careful exploration, that the foundations for that approach, and the conclusion it seemed to indicate, have long since eroded away." 485 F.2d at 800.

The facts of *Democratic Cent. Com.* were well summarized in *Wash. Pub. Interest Org.*, as follows:

"In the *Democratic Central Committee* litigation, the circuit court overturned decisions by WMATC to credit the shareholders of D.C. Transit System, Inc. (Transit) with the capital gains accruing to Transit on its disposition of depreciable and nondepreciable properties acquired at a total price considerably below book value from Capital Transit Company (Capital) in 1959. Transit had acquired Capital's streetcar-bus system subject to a condition imposed by Congress, as part of the franchise award, that Transit convert the enterprise to an all-bus system throughout the metropolitan area. *Democratic Central Committee I, supra* 158 U.S. App. D.C. at 33, 485 F.2d at 812. This was to involve 'removal of abandoned streetcar tracks and regrading and repaving of the abandoned track areas, at an estimated cost of $10,441,958 [footnotes omitted].' *Id.* The Commission authorized Transit to charge this cost of track removal, regrading, and repaving to its customers through adjustments in the rate structure while awarding all gains on disposition of nonoperating trolley facilities to Transit's shareholders—arguably amounting to an investor windfall in view of the acquisition price at considerably below book value.

"Simply put, the circuit court concluded that the net result of these transactions, as approved by WMATC, was unfair to the ratepayers. In taking this position, the court stressed the windfall aspect.

" 'What the investors bought was an ongoing mass-transportation system with physical components, including the lands in question, long since dedicated to public service. We do not mean to imply that had that not been the case, value-appreciations would necessarily have been immune to claims of fare-payers. We do say that since that was the case, it makes those appreciations more susceptible to those claims. [*Democratic Central Committee II, supra* 158 U.S. App. D.C. at 120, 485 F.2d at 899.]'

The court thereupon distinguished the Transit situation from one in which 'the properties [had] been originally purchased outright by Transit's investors with a view to deployment as they pleased.' *Id.*

"The windfall aspect—the peculiar entity—of the D.C. Transit situation is not apparent in the case before us; the *Democratic Cent. Committee* litigation is distinguishable as more egregious on the facts." 393 A.2d at 87-88.

See also *Boise Water Corp. v. Idaho Public Util. Com'n,* 99 Idaho 158, 578 P.2d 1089 (1978).

The present case is also distinguishable from *Democratic Cent. Com.* The situation there can fairly be described as "unique" in

the sense that the ratepayers were in essence the source of the investment funds. Such is not the case here. Although the position taken by KP&L, that as legal owner it is *automatically* entitled to the gain, probably goes too far, the Commission's findings do not support the Commission's method of determining a fair return to the KP&L stockholders.

In the instant case the KCC, in effect, has provided for a return of the capital of the stockholder investors, together with the portion utilized by them for depreciation.

In *Democratic Cent. Com.,* it was said:

"Investors, we have concluded, are not automatically entitled to gains in value of operating utility properties simply as an incident of the ownership conferred by their investments. And it goes without saying that consumers do not succeed to such gains simply because they are users of the service furnished by the utility. Neither capital investment nor service consumption contributed in any special way to value-growth in utility assets. Rather, the values with which we are concerned have grown simply because of a rising market.

"Investors and consumers thus start off on an equal footing, and the disposition of the growth must depend on other factors. We thus reach the dual critical inquiry: identification of the principles which must guide the allocation, as between investor and consumer groups, of appreciation in value of utility assets while in operating status; and application of those principles to Transit's situation." 485 F.2d at 805-6.

As we have concluded above, *Democratic Cent. Com.* is distinguishable from the instant case, yet the above quoted portion from that case is a good general statement of law regarding consideration of capital gain in establishing a fair rate of return to the stockholders on their investment.

As a general rule capital gains are retained by the utility and may be used for dividend distribution or reinvestment. When the utility seeks a rate adjustment, however, the KCC should consider the gain as a factor in the ratemaking process. In doing so they should consider the following guidelines (not intended to be all inclusive) to determine how the gain should be allocated:

(1) The risk of loss of investment capital.
(2) Contribution by the ratepayers to the value of the property, such as maintenance, upkeep and improvements.
(3) Financial integrity of the company, and the effect of the allocation on the price of the stock and the ability of the company to attract adequate capital.
(4) Increases in the value of the property due to inflation.
(5) Increased value of the property due to improvements in

the neighborhood of the facilities sold as a result of special assessments for such things as curbing, guttering, sewage treatment plants, sewers, water, water treatment plants, general street facilities, neighborhood improvement districts, urban renewal, and other matters resulting in increased value of the property which were paid in whole or in part by the ratepayers.

If the effect of the KCC's order relative to the $209,183.00 is that it be "depreciated" or amortized "out" of the rate base over a specific number of years so that that amount will ultimately flow through, in its entirety, to the ratepayers, then the result is that the ratepayers are in effect getting all of the *profit* from the sale of the Salina property. It appears that such is the effect of the KCC order. We conclude that such a "distribution" is unreasonable and that this issue must be remanded to the KCC with instructions that it provide a method by which the stockholders and ratepayers may both benefit from the profit. The KCC should take into account the equities due to both the ratepayers and stockholders by utilizing the above suggested guidelines, together with any other specific considerations the KCC may deem appropriate. After making such equitable division, we feel it is also necessary that the KCC make an order setting forth the specific method chosen to accomplish that purpose. In the event the KCC elects to reduce the rate base by adjustment, as they have done in this case, they should state when and how the amount as adjusted is to be later removed from accumulated depreciation.

IV.   Did the KCC err in its treatment of deferred taxes?

The last issue raised by KP&L concerns the factual setting and proposed adjustment described in the following testimony of staff witness Elic:

"Since Applicant began to defer income taxes on liberalized depreciation in 1970, Federal income ·tax deferrals have been calculated based upon a Federal income tax rate of 48%. The Federal income tax rate has now been reduced, effective January 1, 1979, to 46% for corporations. Based upon the best available current knowledge, the portion of the deferred income tax balance at December 31, 1978 represented by the incremental 2% (difference between 48% and 46%) will never become a tax liability for the Company. In addition, the portion of the deferred balance representing this "2% increment" will never be amortized based on Applicant's current accounting procedures, because Applicant is now computing both deferrals and amortization of past deferrals using a 46% Federal income tax rate. In order to correct this situation, Staff proposes that the portion of the deferred balance at December 31, 1978

representing the "2% increment" be flowed back into operations over a five-year period. This treatment would be consistent with the flowback of the deferred income tax balance due to cost of removal. In addition, by handling this item separately from the normal deferred tax accounting, Applicant would be able to continue to defer and amortize normalized taxes using a 46% Federal income tax rate."

Elic, on cross-examination, admitted that his statement that the 2 percent increment would never be amortized was incorrect, and that under the KCC's order that increment would be amortized over a five-year period, whereas in the absence of such treatment that increment would be amortized over the depreciable life of the property.

The issue is whether the 2 percent increment should be flowed through to the ratepayers over the life of the assets on which the depreciation is based, or over a five-year period.

The KCC order included the following:

"The Commission is of the opinion that Staff Adjustment No. 8 to operations is appropriate and hereby accepts the same. The Commission bases its decision upon the fact that the incremental two percent difference between the federal income tax rate of 48 percent and 46 percent under current circumstances will never become a tax liability for this applicant. Additionally the proposed staff method of treatment will allow the ratepayers to receive the benefit of this change in tax rate. Additionally, the Commission wishes to point out that it cannot agree with the speculations and conjectures of this applicant in regards to their liberalized depreciation being jeopardized by this treatment. The Commission is cognizant of the arguments that have been advanced by this applicant. However the Commission feels that they are based on conjecture and not on fact. *The Commission would advise this applicant that in the event the scenario which they advanced in this case would in fact become a problem for them, this Commission stands ready to deal with problems which might arise from the acceptance of this adjustment.*" (Emphasis added.)

KP&L's response to the italicized part of the above order is simply that later action by the Commission would not alter the benefit of accelerated depreciation already lost by them.

KP&L's argument is that for past years it has accumulated a deferred tax reserve under allowed accelerated depreciation procedures at the 48 percent rate. There is no quarrel as to the propriety of this. Due to the change in corporate tax rates to 46 percent, this reserve is larger than will be required to meet future tax liabilities. The Commission's order has the effect of reducing the reserve by an amount equal to the 2 percent incremental difference over a five-year period rather than by leaving it in the reserve and amortizing it over the life of the plant. KP&L is

concerned because IRS regulations, specifically 26 CFR 1.167(1)-1(h)(2), allow for reductions in the reserve for only three reasons, none of which is a reduction in the income tax rate. Although a reduction of only some $74,000.00 gross revenue results from the adjustment, KP&L's real argument is that by requiring KP&L to reduce its reserve by a method not specifically authorized by the IRS, the Commission jeopardizes KP&L's eligibility to use accelerated depreciation. KP&L's evidence was that the consequences of such a loss of eligibility is of such magnitude that for the year 1979 the benefit of $12,000,000.00 depreciation would have been lost by its combined electric and gas operations. This issue cannot be disposed of simply by considering the limited amount of the adjustment to be de minimis.

A review of cases and IRS rulings fails to disclose resolution of the problem now confronted by KP&L. KP&L indicates that the Missouri Commission has declined to treat the matter as the KCC has, being persuaded that there was a real possibility of loss of eligibility. The New York Commission, however, has adopted a position identical to the KCC. See *Re New York Teleph. Co.,* 32 Pub. U. Rep. 4th 353 (N.Y. 1979):

"When the federal corporate income tax rate was reduced from 48 per cent to 46 per cent, an excess of $41,842,000 in the company's accumulated deferred income tax account was created. The company is willing, in effect, to give this money back to its customers over the life of the property whose depreciation was accelerated and to which, therefore, the deferred excess is attributable. Staff recommended that the excess be returned over a five-year period; the CPB recommended two years; and the attorney general recommended one year. The administrative law judges suggested that we wait for an Internal Revenue Service ("IRS") ruling on the matter before taking action to return the excess any faster than suggested by the company. Staff and the attorney general except, arguing that there is no need to wait for a revenue ruling.

"We note that the company has received a letter from the IRS indicating that its regulations do not prescribe treatment of the excess created in the deferred tax reserve when a corporate tax decrease takes place. The company contended, in oral argument before us, that it is nonetheless possible that the IRS may proscribe the treatment recommended by staff and the attorney general. In that event, the company is concerned its return of the excess over a short period of time will result in loss of its eligibility for accelerated depreciation income tax benefits. We recognize the possibility that a future adverse IRS ruling could be applied retroactively to revoke the company's tax benefit. For this to occur, however, the IRS would have to take the position that the existing statute, 167(e) of the Internal Revenue Code, required at all times whatever treatment is prescribed at any time by the IRS through its interpretive regulations. We believe that the risk of this

occurring is so remote that it would be wrong to delay returning to consumers the excess accumulation solely on this basis. Our intention is not to take any action that will ultimately make the company ineligible for the benefit of liberalized depreciation. We will, therefore, order the company to amortize the reserve over the five-year period recommended by staff because the IRS may decide that money returned to consumers should be restored to the account. In that event, we could stop an amortization over this longer period and thereby minimize the amount to be collected in future rates in order to restore the account. The one-year amortization period advocated by the attorney general would sacrifice this flexibility. Accordingly, we will grant staff's exception." 32 Pub. U. Rep. at 369-70.

The Pennsylvania Commission has adopted a position amortizing the 2 percent increment over a period equal to the period the reserve was being built up. See *Pennsylvania PUC v. Philadelphia Electric Co.,* 33 Pub. U. Rep. 4th 319, 332 (Pa. 1980). No issue was raised there as to whether the utility's eligibility for accelerated depreciation was in jeopardy.

It is not questioned that if the 2 percent increment be amortized over the life of the property, KP&L will not lose its liberalized depreciation. There was sharp disagreement between KCC's and KP&L's witnesses as to whether this liberalized depreciation would in fact be lost if KCC's five-year plan came into effect. From a scrutiny of all the evidence of both KCC and KP&L witnesses, we are convinced that it cannot be said with requisite certainty whether or not KP&L would lose its liberalized depreciation.

Also, there is apparently no dispute that the 2 percent increment *will* be returned to the ratepayers, the question being only whether, for the purpose of ratemaking, the return is amortized over a five-year period or a period equal to the life of the assets involved.

We believe it would be to the disadvantage of *both* the ratepayers and KP&L to require the accelerated five-year method. It is unreasonable that a figure of some $74,000.00 should be pitted in the scales against a potential loss of benefit of utilization for tax purposes of accelerated depreciation in amounts described by KP&L's witness and not refuted by other testimony. It is noted that even staff's expert pointed to no controlling authority which makes it certain that the liberalized depreciation would not be lost. Indeed, his testimony is replete with what he "thinks," and as to what he opines to be probable; his testimony was no more certain or authoritative than the testimony of KP&L's witness which the KCC found to be nonfactual foundation for conjectural

argument. We conclude that KCC's deletion of the $74,000.00 from authorized revenue constitutes an abuse of discretion when considered in conjunction with the enormity of the potential loss to KP&L, and ultimately to its ratepayers.

The KCC's deletion regarding this issue should be reinstated.

Affirmed in part; reversed in part; and remanded with instructions.