NOT DESIGNATED FOR PUBLICATION

No. 114,064

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MOUNDRIDGE TELEPHONE COMPANY, INC.,
*Appellant*,

v.

KANSAS CORPORATION COMMISSION,
*Appellee*.

MEMORANDUM OPINION

Appeal from Kansas Corporation Commission. Opinion filed November 25, 2015. Affirmed.

*Thomas E. Gleason, Jr.*, and *Mark Doty*, of Gleason & Doty, Chtd., of Lawrence, for appellant.

*Brian Fedotin*, deputy general counsel and chief appellate counsel, of Kansas Corporation Commission, for appellee.

Before ARNOLD-BURGER, P.J., PIERRON and SCHROEDER, JJ.

*Per Curiam*:  This administrative proceeding began when Moundridge Telephone Company, Inc., (Moundridge) filed an application for additional funding from the Kansas Universal Service Fund (KUSF) with the Kansas Corporation Commission (Commission). Several months later, Moundridge sought to withdraw its application. The Staff of the Commission objected to the attempt to withdraw and alternatively requested the Commission convert the proceeding into an audit of Moundridge's finances to determine its appropriate KUSF entitlement.

1

The Commission converted the proceeding into an audit and after accepting evidence and hearing testimony, the Commission determined that Moundridge was, in fact, overearning and reduced its KUSF from roughly $250,000 to $0. Moundridge timely filed for reconsideration of the Commission's order. That motion was denied, and Moundridge appeals under K.S.A. 66-118a. Because we find that Moundridge has failed to carry its burden of establishing the Commission's ruling was improper under any provision of the Kansas Judicial Review Act, we affirm.

FACTUAL AND PROCEDURAL HISTORY

Moundridge is a rural telephone company authorized by the Commission to operate in east central Kansas. Moundridge is a rural local exchange carrier (RLEC) that elected to be regulated by the Commission under a traditional rate of return scheme. Moundridge also is designated as a carrier of last resort (COLR) under K.S.A. 2014 Supp. 66-2009. Moundridge operates approximately 2500 access lines to customers in the Moundridge and Goessell, Kansas, service areas.

In early September 2014, Moundridge filed an application with the Commission seeking additional support from the Kansas Universal Service Fund (KUSF). Specifically, Moundridge asserted that its current support from KUSF, together with its earnings, were inadequate to provide enough revenue to allow it to provide sufficient and efficient service to its customers. Moundridge provided a substantial amount of confidential financial documentation which the company stated showed it was entitled to an additional $725,000-plus in KUSF funding based on a test year ending December 31, 2013. It also presented the prefiled testimony of its president, Carl C. Krebiel, and an expert witness, Tim J. Morrissey.

Moundridge, a Subchapter S corporation, is a wholly owned subsidiary of Emmental, Inc. Emmental, Inc., provides management services to Moundridge and its

2

nonregulated affiliated entities. The subsidiaries of Moundridge include Moundridge Telecom, which provides long-distance telecommunication services. Another subsidiary is Zaziwil, Inc., which functions as a holding company for the group's investments. Moundridge also provides labor and other services to Mid-Kansas Cable Services, Inc., a separate company which provides cable television and high-speed internet services and acts as an agent for Alltel wireless services by selling cellular telephone service plans, phones, and accessories. Finally, Mid-Kansas Cable shares common officers and directors with KCC Rentals, Inc., which owns a building leased to Moundridge for outside plant employees. There is significant overlap in officers, directors, and employees between all related entities.

As is routine in most applications seeking KUSF support or rate increases, the Commission issued an order suspending Moundridge's application for 240 days as provided in K.S.A. 66-117 and ordered its Staff to complete a full investigation of the application. In early October 2014, the Commission issued a scheduling order setting forth deadlines for the filing of prefiled testimony by Staff responding to Moundridge's application, any rebuttal testimony, as well as a cutoff date for discovery.

Two months later, and just 5 weeks before Staff's prefiled testimony was due, Moundridge filed a pleading entitled "Withdrawal of Application." The pleading gave no explanation as to why Moundridge was withdrawing its application or why it decided it no longer needed the additional KUSF funds.

Shortly thereafter, Staff for the Commission filed a motion opposing the withdrawal of Moundridge's application. In the alternative, Staff requested the Commission convert the proceedings into a Commission-initiated audit under the Commission's authority to manage the KUSF. Staff argued that it had spent considerable time reviewing Moundridge's application. Staff further reported that its initial review of the application suggested that Moundridge did not need additional KUSF monies and that

3

it was, in fact, overearning and that its current KUSF allotment should be reduced. Moundridge objected to Staff's request on a variety of grounds not ultimately raised in this appeal. The court granted Staff's motion and issued an order converting the docket into a KUSF audit of Moundridge, with all orders, filings, and discovery incorporated into the converted proceeding. Moundridge sought reconsideration of this order, which was denied by the Commission except for modification of the procedural schedule. Although Moundridge continued to challenge the Commission's authority to convert its application proceeding into a KUSF audit throughout the proceedings, that issue is not raised on appeal.

Meanwhile, the Commission's Staff filed testimony of four Staff employees, Andria Finger, Chad Unrein, Adam Gatewood, and Katie Figgs. Staff also presented the testimony of an independent CPA, Ann Diggs, and consultant Roxie McCullar. Finger and Diggs testified that Moundridge's application had overstated its net intrastate Rate Base and had an unreasonably high rate of return. Unrein recommended various adjustments to Moundridge's income statements. Gatewood recommended the use of a hypothetical capital structure to determine Moundridge's appropriate return on equity and testified that Moundridge's actual capital structure was heavily weighted in equity capital. According to information provided in its testimony, Moundridge's actual capitalization was 4.66% debt and 95.34% equity capital. CPA Diggs also recommended alterations in the manner in which Moundridge allocated its costs and expenses between its regulated business and its nonregulated affiliates and took issue with Moundridge's payroll costs. Thus, based on its calculations and adjustments, Staff found that Moundridge was overearning more than its annual level of KUSF and, accordingly its KUSF should be changed to $0.

Shortly before the public hearing, Moundridge and Staff filed a Joint List of Contested Issues. Those issues included:  (1) the appropriate capital structure of Moundridge; (2) whether funding Moundridge lost from the Federal Universal Service

4

Fund (FUSF) should be imputed to its revenues; (3) the proper amount of depreciation expenses; (4) rate case/audit expenses; (5) disallowance of intrastate employee compensation; (6) disallowance of intrastate management fees; and (7) allocation of intrastate expenses to nonregulated entities.

The Commission heard live testimony from various witnesses on February 25, 2015. Thereafter, several posthearing briefs and motions were filed. Moundridge's original posthearing brief did not address the income tax issue raised by one of the Commissioners during the hearings. In its brief, however, Staff not only responded to Moundridge's various arguments but also addressed the income tax issue. Staff cited K.S.A. 2014 Supp. 79-32,117(c)(xx)(1) indicating that shareholders of Subchapter S corporations paid 25% in federal income taxes on the company's pass-through income, but no state income taxes. Staff stated that additional schedules would be provided to the Commission that would comply with judicial precedent that the lowest income tax burden would be calculated for purposes of determining Moundridge's income tax expense.

On April 27, 2015, the Commission issued its order setting Moundridge's cost-based universal service support at $0. After setting forth the procedural history of the proceeding, the Commission first addressed the question of the appropriate capital structure that should be used in calculating Moundridge's rate of return. Although Staff and Moundridge agreed on the cost of capital to be used in the rate of return calculation, the Commission discussed Moundridge's actual capital structure, which was equity-heavy. Staff proposed a hypothetical capital structure of 60% equity and 40% debt. The Commission reviewed the testimony of witnesses for both parties and acknowledged Moundridge's argument that it faced greater risk because of its need to upgrade its network infrastructure. After this review, the Commission rejected Moundridge's arguments and adopted the hypothetical 60-40 capital structure recommended by Staff finding that the ratio struck a better balance between the interests of Moundridge's investors and Kansas consumers who contribute to KUSF.

Next, the Commission addressed the effect of recent changes in the federal universal service fund process which resulted in the adoption of K.S.A. 2014 Supp. 66-2008(e)(2). As noted in *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, (No. 112,364, this day decided), the Federal Communications Commission (FCC) issued the USF/ICC Transformation Order (Transformation Order). *In the Matter of Connect America Fund*, 26 FCC Rcd 17663 (2011). In the Transformation Order, the FCC determined that the FUSF system established in 1996 was not effective in encouraging the best technological expansion by carriers receiving support for high cost areas. Transformation Order, 26 FCC Rcd at 17672, ¶ 18.

In response to the FCC's major revisions, the Kansas Legislature amended K.S.A. 2014 Supp. 66-2008(e) in two respects. First, the legislature added subsection (e)(2) that states:

> "(2) Notwithstanding any other provision of law, no KUSF support received by a local exchange carrier electing . . . to operate under traditional rate of return regulation *shall be used to offset any loss of federal universal service fund support for such carrier*, except that such limitation on KUSF support shall not preclude recovery of reductions in intrastate access revenue pursuant to subsection (c) of K.S.A. 66-2005, and amendments thereto." (Emphasis added.) K.S.A. 2014 Supp. 66-2008(e)(2).

In addition, the legislature, for the first time, placed a cap on annual KUSF distributions made to all local exchange carriers operating under traditional rate of return regulation to $30,000,000 annually. A waiver of the cap could be granted based on a showing that a carrier would experience significant hardship due to force majeure or natural disaster. K.S.A. 2014 Supp. 66-2008(e)(3).

In light of K.S.A. 2014 Supp. 66-2008(e)(2), the Commission evaluated the funding that Moundridge lost under the altered FUSF process. During 2013, the support received from Moundridge's federal funds, known more specifically as its High-Cost

Loop (HCL), was just over $530,000. Staff compared that support with the actual HCL support Moundridge received from July 2, 2011, to June 30, 2012, totaling $816,000. Based upon these figures, Staff asserted that Moundridge's federal support had been reduced in 2013 by $278,160—the difference between the support over the 2-year period. Staff recommended that the difference should be imputed as revenue to Moundridge to ensure that KUSF was not being used to offset any losses from the FUSF as provided by the statute. Moundridge disputed Staff's interpretation of the statute, but the Commission agreed with Staff that the statute unambiguously prevented KUSF to be used to cover for *any* loss of FUSF, including federal support for HCL.

The Commission also was required to address the parties' dispute over the depreciation expense Moundridge claimed on its plant and physical property. Although Moundridge was claiming over $860,000 in depreciation expense, Staff contended the appropriate depreciation expense was approximately one-half of what the company requested. The Commission reviewed the evidence from both parties and concluded that all depreciation expenses should be synchronized on the same date as account balances and accumulated depreciation accounts:  September 30, 2014. The Commission accepted Staff's adjustment finding that depreciation expense could not be applied to fully depreciated assets or to provide monies for replacement of a fully depreciated asset.

Other disputed issues included Staff's recommended disallowance of some employee compensation and management fees allocated to Moundridge's intrastate regulated services. With respect to Moundridge employee salaries, Staff asserted that the company's salaries and bonuses unreasonably exceeded prevailing rates at comparable companies. In response, Moundridge claimed that its salaries had been reviewed in a 2007 audit and found to be reasonable. The Commission chose to follow its recent trend in KUSF audits to compare employee compensation between similarly sized carriers to determine the reasonableness of labor costs. The Commission expressed concern that in light of Moundridge's claimed operating loss, it had made no attempt to reduce wages or

bonuses, especially with the three company officers who work for Emmental. Because salaries are set by employees shared by Emmental and its board of directors is composed of all the Emmental employees, the Commission found there was no independent oversight of employee compensation. Accordingly, based on the comparison with other companies, the Commission reduced employee compensation expenses by almost $73,000.

Similarly, in addressing management fees Moundridge paid to Emmental, the Commission expressed concern with the amount of fees the parent company charged to Moundridge as compared to its nonregulated subsidiaries and affiliates. Staff contended that Emmental's managers had violated an earlier Commission order requiring managers to directly report time between the various affiliates and found that some of the fees Moundridge included in its calculations were unnecessary for Moundridge's regulated activities. Moundridge objected to the allocation of 32.5% of Emmental's management fees to the nonregulated businesses and argued that Staff's recommendations ran contrary to its recommendations in Moundridge's 2008 KUSF proceeding.

The Commission reviewed the evidence, and discussed the requirements of federal regulations and the question of whether it was impractical for Emmental's managers, three of whom provide service to Moundridge, to directly report time spent on Moundridge's management. Because Moundridge admitted it failed to follow the positive time reporting procedures as agreed in the Stipulated Settlement Agreement from the 2008 KUSF case and failed to provide credible proof of how the management employees spent their time, the Commission accepted Staff's recommendation that reduced over $235,000 in management fees from Moundridge's allowed expenses.

Moundridge further disputed the Staff's concerns that shared expenses between Moundridge and its nonregulated affiliates were not properly allocated between the different companies. Moundridge disputed Staff's adjustments claiming the shared

8

expenses were already removed from the books to nonregulated operations; accordingly, Staff's adjustments reducing the company's intrastate expenses by nearly $90,000 double-counted the changes already made on the company's books. Ultimately, Staff agreed that with respect to three of the four accounts, the expenses had been removed twice. However, Staff still requested a reduction for the management fees. Again, the Commission rejected Moundridge's arguments and accepted Staff's recommendations.

The final issues addressed by the parties was the proper income tax expense Moundridge could claim. Moundridge is a Subchapter S corporation which does not pay income taxes but whose shareholders are assessed their proportionate share of the corporation's income for purposes of paying income taxes. Under standard Commission procedures, as imposed by the Court of Appeals, the company is required to determine the amount of income taxes the Subchapter S corporation shareholders pay as compared to what the company would pay if it was a Subchapter C corporation. The lower of these two amounts would be treated as the regulated utility's income tax expense. *Greeley Gas Co. v. Kansas Corporation Commission*, 15 Kan. App. 2d 285, 287, 807 P.2d 167 (1991). In prefiled testimony, both parties agreed that a state income tax expense rate of 4.82% was appropriate.

Early in the hearing, however, one of the Commissioners noted that 2014 changes in the tax statutes assessed no state income taxes on Subchapter S corporations, sole proprietorships, and LLCs. The Chair of the Commission also asked questions pertaining to the tax issue. Commissioner Apple directed a Staff witness to follow up to make sure the calculations reflected the 2014 tax laws. Staff provided updated calculations in its posthearing brief demonstrating that treating Moundridge as a Subchapter S corporation resulted in the lowest tax burden for the utility. Although Moundridge asserted that the Commission had failed to properly take administrative notice of the tax statutes prior to the closing of the record, the Commission accepted Staff's revised income tax assessment based upon the Subchapter S corporation tax rates.

Based upon all the adjustments that the Commission accepted to Moundridge's financial statements, the Commission found Moundridge was earning excess revenue of $470,000 per year. Because this amount exceeded Moundridge's current annual KUSF support which was just over $249,000, the commission reduced Moundridge's KUSF to $0.

Moundridge filed a timely petition for reconsideration jointly with a motion for order increasing KUSF support and to stay the effect of the order. In its motion, Moundridge took issue with Commissioner Emler's name in the order after he recused from the proceeding. Moundridge also took issue with the form of the order in its failure to address Moundridge's ongoing objection to the Commission's authority to convert an application for additional KUSF support into an audit proceeding. Moundridge also claimed the order failed to comply with K.S.A. 77-526 and K.A.R. 82-1-232 by failing to address, consider, and resolve all arguments and matters in issue and failed to provide adequate findings of fact and conclusions of law, along with the policy reasons for its various decisions. In addition, Moundridge repeated its arguments regarding the Commission's various adjustments effectively reducing Moundridge's revenue requirement in order to abrogate its entitlement to KUSF. With respect to the income tax issue, Moundridge noted that the record was closed when the Commissioner's order was issued and there was no evidence or administrative notice taken of the tax statute. Thus, Moundridge argued the Commission should have accepted the state income expense as agreed by the parties in prefiled testimony: a State income tax rate of 4.82%.

On June 4, 2015, the Commission issued an order denying Moundridge's motions for reconsideration and for an increase in KUSF support. The order addressed every issue raised in Moundridge's motion for reconsideration, including its claim that the Commission's order failed to comply with state statutes and regulations, the change in state income tax statutes, and the various other issues in dispute.

10

Moundridge then timely filed its petition for review with this court. Additional facts will be provided in the analysis below.

We pause to note that Moundridge requested an extension of time to file its brief, which the Commission did not oppose. As part of that extension of time, Moundridge waived the standard 120-day limit contained in K.S.A. 66-118g(b) for the issuance of the opinion from this court for an additional 30 days.

ANALYSIS

*Standard of Review*

In reviewing Moundridge's arguments, our scope of review is governed by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*., and specifically by K.S.A. 2014 Supp. 77-621(c). See K.S.A. 66-118a(b); *Sierra Club v. Moser*, 298 Kan. 22, 47, 310 P.3d 360 (2013). K.S.A. 2014 Supp. 77-261(c) enumerates eight circumstances under which a court may grant relief from an agency action. Of those eight circumstances, Moundridge's petition for judicial review and amended brief relies on three of these provisions. Moundridge contends:  (1) the Commission has "erroneously interpreted or applied the law " in its interpretation of K.S.A. 2014 Supp. 66-2008(e)(2); (2) the Commission's action is based on a determination of fact not supported by the record as a whole; or (3) the Commission's action is otherwise "unreasonable, arbitrary or capricious." K.S.A. 2014 Supp. 77-621(c).

On appeal, the Commission's findings are presumed valid, and its order may only be set aside by the court if it is not supported by substantial competent evidence, is without foundation in fact, or is otherwise unreasonable, arbitrary, or capricious. *Kansas Industrial Consumers v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 332, 335, 42 P.3d 110 (2002). The party claiming the Commission's actions are invalid bears the

11

burden of proving that invalidity. See *Clawson v. Kansas Dept. of Agriculture*, 49 Kan. App. 2d 789, 795, 315 P.3d 896 (2013).

The legislature has vested the Commission with broad discretion in executing its functions, and its findings are presumed valid on review. Because discretion is delegated to the Commission, the courts lack authority to substitute their judgment for that of the Commission. More importantly, the Commission's decisions involve complex problems of policy, accounting, economics, and other special knowledge that go into fixing utility rates. As a result, the court may not set aside a Commission order merely because the court would have arrived at a different conclusion had it been the trier of fact. The court may reverse or nullify a Commission order only when the decision "'"is so wide of the mark as to be outside the realm of fair debate."'" *Kansas Industrial Consumers*, 30 Kan. App. 2d at 336.

It is not this court's responsibility to reweigh the credibility of the witnesses or the evidence. "'"Nothing can be gained by making a comparison of conflicting testimony. The commission is the trier of facts. The commission had the expertise through its staff to sift and evaluate . . . conflicting testimony." [Citation omitted.]'" *Mobil Exploration & Producing U.S. Inc. v. Kansas Corporation Comm'n*, 258 Kan. 796, 815, 908 P.2d 1276 (1995) (quoting *Southwest Kan. Royalty Owners Ass'n v. Kansas Corporation Comm'n*, 244 Kan. 157, 166, 769 P.2d 1 [1989]).

Based upon this standard of review, we next turn to the specific issues raised by Moundridge.

*The Commission's orders provided an adequate basis for appellate review and are valid under the standards of K.S.A. 77-526(c) and K.A.R. 82-1-232(a)(3).*

In its first issue, Moundridge contends the Commission's order fails to comply with statutory and regulatory standards and, therefore, is invalid. Because the order is invalid, Moundridge contends that is original application for additional KUSF should be deemed approved. Although Moundridge contends that the final order fails to address and resolve all matters raised and fails to make adequate findings of fact, the company does not point to any specific portion of the order that is inadequate or any issue which remains unresolved. The only clear statement Moundridge makes is that the order failed to give consideration to the policy goals of the Kansas Telecommunications Act (KTA), set forth in K.S.A. 66-2001.

In challenging the validity of the order, Moundridge relies on the provisions of K.S.A. 77-526(c) and K.A.R. 82-1-232(a)(3). To the extent Moundridge raises issues of the interpretation of statutes and regulations, the court's standard of review is de novo. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015) (interpretation of a statute is a question of law over which appellate courts have unlimited review).

> "(c) A final order or initial order shall include, *separately stated, findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion*, for all aspects of the order . . . . Findings of fact, if set forth in language that is no more than mere repetition or paraphrase of the relevant provision of law, shall be accompanied by a *concise and explicit statement of the underlying facts of record to support the findings*. . . ." (Emphasis added.) K.S.A. 77-526(c).

Similarly, the regulation mandates that each order of the Commission "shall" contain "a concise and specific statement of the relevant law and basic facts that persuade the commission in arriving at its decision." K.A.R. 82-1-232(a)(3).

A review of the initial order and final order reflects that the Commission addressed each of the issues that the parties raised in a prehearing list of disputed issues. With respect to each issue, the Commission discussed the evidence and arguments of both parties and explicitly stated the evidentiary basis for the decision it made. Where appropriate, it explained the legal basis and or credibility determination underpinning its decision.

Our Supreme Court has held that the Commission is not required to render its findings of fact in minute detail. The findings must be specific enough to allow judicial review of the reasonableness of the order. *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988). However, the Commission's findings do not have to discuss all the evidence presented in a proceeding. *In re Application of Southwestern Bell Tel. Co.*, 9 Kan. App. 2d 525, 535, 685 P.2d 304, *rev. denied* 236 Kan. 875 (1984). Likewise, the Commission is not required to explain why it did not accept every piece of evidence presented. *Southwest Kan. Royalty Owners Ass'n*, 244 Kan. at 190. The Commission's findings will be upheld, "'though of less than ideal clarity, if the agency's path may reasonably be discerned.' [Citations omitted.]" *Western Resources, Inc. v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 348, 374, 42 P.3d 162, *rev. denied* 274 Kan. 1119 (2002).

Moundridge's only clear complaint appears to be that the Commission did not discuss the policy provisions of the KTA, as set forth in K.S.A. 66-2001. However, this case involves the audit of a RLEC for purposes of determining its entitlement, if any, to KUSF support. It calls for factually based decisions determining Moundridge's embedded costs, expenses, and revenue requirement which are governed by evidence presented and standardized requirements. KUSF calculations are not the type of policy decisions that require the explicit weighing of the factors in K.S.A. 66-2001.

14

For these reasons, the Commission's orders provided an adequate basis for appellate review and are valid under the standards of K.S.A. 77-526(c) and K.A.R. 82-1-232(a)(3).

*The Commission did not misinterpret or misapply K.S.A. 2014 Supp. 66-2008(e)(2) by imputing "lost" FUSF support as income to Moundridge.*

In its second issue, Moundridge disputes the Commission's decision to impute income it did not receive because of a reduction in federal High Cost Loop (HCL) support between 2012 and the test year 2013. First, Moundridge contends that by imputing nonexisting income, the Commission violated K.S.A. 2014 Supp. 66-2005(c)(1) and K.S.A. 2014 Supp. 66-2008(e)(1) that requires KUSF to provide RLECs support for any reduction of its intrastate access revenue. Moundridge disputes the Commission's interpretation that K.S.A. 2014 Supp. 66-2008(e)(2) effectively gives the Commission authority to impute income of lost federal support because it is contrary to traditional rate of return regulation principles. Moundridge further claims that disallowing KUSF recovery allegedly required by K.S.A. 2014 Supp. 66-2008(e)(2) is completely different than imputing income.

Alternatively, Moundridge asserts that if income is imputed, it should take into account the 2-year lag time involved with HCL support and use the reduced HCL support calculated based on the test year data rather than the HCL support received during the test year. This synchronization, according to Moundridge, is the only manner to comply with the K.S.A. 66-2001 goals of the KTA.

Moundridge's arguments regarding its rate-of-return status under the KTA ignores the fact that the KTA was based on the Federal Telecommunications Act of 1996 (FTA), 47 U.S.C. § 151 *et seq.* (2012). The FTA attempts to add competition to the telecommunications industry while ensuring universal service is provided to consumers.

15

*Alenco Communications, Inc. v. F.C.C.*, 201 F.3d 608, 614-15 (5th Cir. 2000). Thus, although Moundridge elected to be overseen by the Commission under a rate-of-return structure, the universal service mandates the opening of local telephone markets to competition. 201 F.3d at 615. As previously recognized by the federal courts, the FTA does not "guarantee all local telephone service providers a sufficient return on investment"; rather it is designed to ensure universal service to customers and to encourage competition. 201 F.3d at 620.

In her testimony, Staff witness Roxie McCullar reviewed Moundridge's separations study as to how it allocates its income and expenses between its interstate and intrastate operations. In her review, McCullar recommended that Moundridge's income be increased by $278,160 to account for the actual reduction in federal HCL support Moundridge received as compared to the same support it received the year before. McCullar testified that this reduction should still be treated as income based on K.S.A. 2014 Supp. 66-2008(e)(2) because KUSF cannot be used to offset any loss in FUSF support. Staff based its calculations on the HCL support Moundridge earned in the 12-month period ending June 30, 2013, and compared it to the HCL support Moundridge acknowledged it received in the 12-month period ending June 30, 2014; the difference between that 2-year period was an HCL reduction of $278,160.

In response to Staff's imputing of federal HCL revenue, Moundridge asserted that the adjustment imputes an increase in revenue rather than merely disallowing KUSF recovery for lost HCL support. Moundridge argues that in the future, its federal HCL revenue will continue to decrease. Moundridge further argues that this reduction in revenue is normal and "generally unrelated" to the Transformation Order. According to the company, Staff and the Commission were incorrect in their interpretation of K.S.A. 2014 Supp. 66-2008(e)(2) because the legislation was intended to address losses attributable only to the Transformation Order which capped federal support per line. Moundridge claims that its loss of HCL support was not impacted by the Transformation

16

Order because its support does not exceed the $3,000 cap per line. Finally, Moundridge's expert testified that the company could not recover this imputed revenue from other sources as a result of statutory limits on raising local charges or lack of access to alternative federal support systems.

Moundridge makes several arguments. First, it contends that the HCL support was not impacted by the Transformation Order, and therefore K.S.A. 66-2008(e)(2) does not apply to it. This contention is unsupportable. The Transformation Order significantly altered how eligible telecommunication carriers would receive federal universal service support (FUSF). The Transformation Order replaced the FUSF with two other support mechanisms. The Connect America Fund (CAF) would be provided only in areas where a federal subsidy was necessary to ensure the build-out and operations of broadband networks. Transformation Order, 26 FCC Rcd at 17673, 17827, ¶¶ 24, 503. For the rate-of-return RLECs, they would not be entitled to CAF support *unless they offered broadband services of the quality required by the Order* to any customer in their service area upon reasonable request. Transformation Order, 26 FCC Rcd at 17674, ¶ 26. The second method RLECs could use to recover losses due to the reduced terminating access fees was through a monthly Access Recovery Charge (ARC) to their customers. Under the ARC process, the RLEC could increase residential and business line rates through incremental price increases to those customers. Transformation Order, FCC Rcd at 17677, ¶ 36.

The Transformation Order also impacted other portions of RLEC's funding. The order set up a framework to encourage efficiencies by extending existing corporate operations expense limits to existing high-cost loop (HCL) support and interstate common line support. The FCC also reduced HCL support for carriers that maintain artificially low end-user voice rates, and with other restrictions, capped per-line support with a gradual phase-down of this support. Transformation Order, 26 FCC Rcd at 17674, 17742, 17744-45, ¶¶ 27, 211, 217-21.

Notwithstanding these arguments, HCL has long been a part of federal universal service funding. When the FTA was adopted, the FCC included FUSF funding to subsidize high-cost rule RLEC's costs if their "loop costs" were significantly above the national average. *In re FCC Order No. 11-161*, 753 F.3d 1015, 1037 (2014); *Alenco*, 201 F.3d 608; see also *In the Matter of the Federal-State Joint Board on Universal Service*, 17 FCC Rcd 11472-484 (2002) (addressing Commission's modification of rules for providing high-cost universal service support to rural telephone companies as to how high-cost loop support would be calculated). While the Transformation Order placed caps on HCL support, the HCL subsidy was still a part of the original FUSF program. Because K.S.A. 2014 Supp. 66-2008(e)(2) prohibits the use of KUSF from offsetting "*any loss* of federal universal fund support," reductions in HCL are properly considered in calculating KUSF support. (Emphasis added.) The plain language of the statute does not tie the prohibition of offsets to the Transformation Order but to "any loss" of FUSF. *Cf. GTC, Inc. v. Edgar*, 967 So. 2d 781, 792-93 (Fla. 2007) (upholding state agency's reduction of telecommunication carrier's request for hurricane repair funding by offsetting projected FUSF funding carrier would receive through HCL support).

Moundridge argues, however, that this statute conflicts with K.S.A. 2014 Supp. 66-2005(b) which requires KUSF to be based on the company revenue requirement and embedded costs and with "traditional rate of return regulation." Moundridge's arguments are not persuasive, however. After the Transformation Order was issued, the Kansas Legislature made a number of amendments to the KTA to address, at least in part, the impact of the federal rules. Two of those revisions included the no-FUSF replacement provision as well as the statutory cap on total KUSF funding. L. 2013, ch. 110, sec. 11. Moundridge seems to argue that because of the "conflict" between K.S.A. 2014 Supp. 66-2005(b) and K.S.A. 2014 Supp. 66-2008(e)(2), the latter should be ignored. In fact, it appears the legislative amendments were designed to avoid the shift of reduced FUSF support to the State. This follows along with the Transformation Order's goals in

18

reducing the burden on consumers who contribute to the FUSF (and to the KUSF) and in compelling telecommunication carriers to become more efficient.

When construing statutes to determine legislative intent, appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible. *Friends of Bethany Place v. City of Topeka*, 297 Kan. 1112, 1123, 307 P.3d 1255 (2013). In this case, it is clear that K.S.A. 2014 Supp. 66-2005(b) and K.S.A. 2014 Supp. 66-2008(e)(1) establish the general rule for determining KUSF distributions. K.S.A. 2014 Supp. 66-2008(e)(2) creates an exception to the general principle that the Commission consider the RLEC's embedded costs and revenue requirement, *i.e.*, KUSF cannot replace funding lost as a result of FUSF changes. There simply is no conflict between the two provisions.

Moreover, it is clear that the 2013 legislation originally proposed by various telecommunication companies, including some of the RLECs, was amended as it traveled through legislative committees. H.B. 2201, as originally proposed, would have amended K.S.A. 66-2008 by requiring the Commission, until at least 2016 to determine KUSF support in the same manner as it did as of January 1, 2013. House J. 2013, p. 138. The provision which ultimately became K.S.A. 2014 Supp. 66-2008(e)(2) was added by an amendment by the Senate Committee on Utilities. Sen. J. 2013, p. 408. Based upon these revisions, the legislature specifically refused to totally freeze RLEC's entitlement to KUSF distributions by adding subsection (e)(2) to K.S.A. 66-2008. Accordingly, Moundridge's statutory argument is rejected.

Moundridge argues that even if K.S.A. 2014 Supp. 66-2008(e)(2) is lawful, the Commission acted unlawfully by *imputing income* from the reduced federal HCL support. It contends that imputing income is an improper mechanism for carrying out the new statutory provision. However, Moundridge fails to provide any alternative mechanism for the Commission to use when enforcing K.S.A. 2014 Supp. 66-2008(e)(2).

19

If the Commission simply ignored the HCL reduction, the absence of that federal support will have reduced Moundridge's revenues as used in determining the company's revenue requirement; this achieves Moundridge's goal of increasing its KUSF distribution but undermines the explicit purpose of the statute. The Commission took reasonable action in ensuring compliance with K.S.A. 2014 Supp. 66-2008(e)(2) by imputing the revenues Moundridge lost from federal universal support.

Alternatively, Moundridge argues that if lost federal support revenues can be imputed to determine its KUSF entitlement, the amount imputed as income should be "synchronized" with the test year ending December 31, 2013, or the alternative ending date of September 30, 2014. Moundridge argues that there is a 2-year lag in payment of federal HCL. Thus, although the reduced federal support was received in 2013, the support was based upon costs and usage during the 2011 calendar year. Accordingly, Moundridge argues that the Commission should have considered the 2-year lag period and consider the federal HCL calculated on its 2013 year *operations*. According to the Company, the federal support based on 2013-year operations was reduced by only $67,698, rather than the $278,160 revenue differential used by the Commission.

The concept of synchronization in ratemaking ensures that rate calculations are based on revenues, rate base, and expenses covering the same time period, normally a test year used in the utility's initial rate application. *Kansas Power & Light Co. v. Kansas Corporation Commission*, 5 Kan. App. 2d 514, 519, 620 P.2d 329 (1980), *rev. denied* 229 Kan. 670 (1981). Thus, test year data is generally used, although pro forma adjustments are permitted when they are ""*known and measurable.*""" *Kansas Power & Light Co.*, 5 Kan. App. 2d at 519. However, Moundridge's arguments do not appear to be an effort at synchronization since it is undisputed that had there been no changes to the federal HCL support, Moundridge would have *realized the revenue in 2013*, regardless of what year the data was based upon. Moundridge cites to no legal authority that requires this type of synchronization for built-in regulatory lag. *Cf. Kansas Gas & Electric Co. v. Kansas*

20

*Corporation Commission*, 5 Kan. App. 2d 63, 64, 612 P.2d 184, *rev. denied* 228 Kan. 806 (1980) (it was not unreasonable for Commission to fail to allow for regulatory lag between completion of new energy plant and the Commission order approving inclusion of the new plant in the company's rate base).

Likewise, Moundridge's repeated reliance on the "traditional rate of return" mantra is unavailing. The Kansas appellate courts have repeatedly recognized that the Commission has broad discretion in many aspects of determining rates for regulated utilities in light of the complex issues it addresses. *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 496, 720 P.2d 1063 (1986). "A public utility has no vested right in any one particular formula or method, and the State Corporation Commission is not bound to use any particular formula, or combination of formulae, in valuing a public utility's property for rate making purposes." *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, Syl. ¶ 3, 386 P.2d 515 (1963). This broad authority has been recognized in the Commission's actions in determining a variety of rate elements. See, *e.g.*, *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, 47 Kan. App. 2d 1112, 1131, 284 P.3d 348 (2012) (rate case expenses); *Western Resources, Inc.*, 30 Kan. App. 2d at 372 (calculating depreciation of plant facilities); *Aquila, Inc. v. Kansas Corporation Comm'n*, No. 94,326, 2005 WL 1719705, at *3 (Kan. App. 2005) (unpublished opinion) (determining capital structure and return on equity).

The Commission, as with any administrative agency, is a creature of statute and is bound by its authorizing statutes to carry out its functions, and any exercise of authority claimed by the Commission must come from the statute. See *Citizens' Utility Ratepayer Bd. v. Kansas Corporation Comm'n*, No. 101,452, 2009 WL 596580, at *5 (Kan. App. 2009) (unpublished opinion) (citing *American Trust Administrators, Inc. v. Kansas Insurance Dept.*, 273 Kan. 694, 698, 44 P.3d 1253 [2002]). It is duty bound to find a reasonable method in which to enforce its statutory obligation to protect KUSF and enforce K.S.A. 2014 Supp. 66-2008(e)(2). Moundridge has failed to establish that the

21

Commission misinterpreted the statutes or acted in an arbitrary or capricious manner in imputing income to Moundridge to ensure KUSF support is not used to offset Moundridge's loss of federal HCL support. Accordingly, Moundridge's argument is rejected.

*The Commission did not act arbitrarily and capriciously in imposing a hypothetical capital structure for Moundridge operations.*

In its third argument, Moundridge contends that the Commission's decision to use a hypothetical capital structure in determining its rate of return—60% equity and 40% debt—rather than its actual capital structure was arbitrary and capricious. According to Moundridge's financial records, its actual capital structure was 4.66% debt and 95.34% equity.

Moundridge contends that the Commission accepted the testimony of Adam Gatewood in support of the use of a hypothetical capital structure but that Gatewood's testimony was fatally flawed. The company argues that Gatewood failed to correctly evaluate Moundridge's financial stability, disregarded the Company's level of risk, and arbitrarily imposed a "false" capital structure. Moundridge contends that the Commission's sole rationale for adopting the hypothetical capital structure was to reduce Moundridge's KUSF support. Moundridge further argues that the Commission erroneously compared it to the Wamego and S&T telecommunications companies in determining its risk.

Staff's witness Adam Gatewood testified about these recommendations and concluded the hypothetical capital structure was appropriate based on similarly situated Kansas RLECs—Wamego and S&T companies—and the expected returns for capital markets. Gatewood concluded these companies faced similar risks and financial challenges. Gatewood noted that Moundridge has the ability to use more debt capital and

by doing so, the hypothetical capital structure would offer a better balance between the competing interests of the owners and customers that contribute to KUSF. Gatewood opined that a 60% equity ratio was about as high an equity ratio that can be defended in carrying the KUSF's objectives. The higher equity structure of Moundridge only benefits its owners, and the structure falls outside the norm of other RLECs and far outside of what is cost effective. Gatewood testified that RLECs are able to obtain debt at relatively low interest rates and the hypothetical capital structure would not impair the company's ability to access additional capital. Gatewood concluded that the rate of return determined by the capital structure conveys sufficient revenues to cover interest and principle payments and that its TIER ranking was sufficient for the company to maintain its financial health.

In response, Moundridge's expert Morrissey objected to that dramatic shift of the capital structure from Moundridge's actual structure. Morrissey testified that Moundridge faces relatively more risk compared to other companies and that the use of its actual capital structure is commensurate with the risk the company faces. Morrissey explained that Staff's comparison of Moundridge with S&T and Wamego was inappropriate because the other companies had much larger rate bases because they had already significantly deployed fiber to the home (FTTH) in their network; in addition, those companies' operating income was much higher. Meanwhile, Moundridge still needed to upgrade its network to the FTTH infrastructure and such investments are much riskier because of federal and state regulations limiting the recovery of future costs from universal service mechanisms. Although Morrissey agreed the cost of capital was subjective, the actual capital structure should produce a rate of return that reasonably aligns with the risk. Moreover, Morrissey testified that the rate of return is inadequate under Gatewood's TIER calculations because of the reduced expenses and the imputed income Staff proposes. Using Staff's adjustments results in a negative TIER establishing that Moundridge would not have sufficient income to cover its interest expense.

23

During the hearing, Gatewood admitted on cross-examination that his TIER calculations included the imputed income Staff calculated as lost federal HCL support that KUSF could not replace. Likewise, Moundridge would likely be required to advise investors of the changes in FUSF support mechanisms and that the imputed income could not be claimed as an asset.

After reviewing all the evidence, the Commission rejected Moundridge's arguments and adopted the hypothetical 60-40 capital structure recommended by Staff; the Commission found that the 60-40 ratio struck a better balance between the interests of Moundridge's investors and Kansas consumers who contribute to KUSF. The Commission rejected Moundridge's claims that it faced more risk than the companies it was compared to, noting that the company's cash and readily available investments were sufficient to pay off its debts. The Commission also found that Moundridge failed to quantify its "greater risk." Finally, the Commission rejected Moundridge's claim that its risk was higher, warranting the equity-heavy capital structure. The Commission found that Moundridge's failure to deploy FTTH prior to 2014 was within its control and that Moundridge apparently decided to return higher profits to investors rather than to invest in its infrastructure prior to 2013.

*The Impact of Capital Structure in the Rate-Making Process*

In order to understand the importance of capital structure in determining a regulated company's revenue requirement (and indirectly its entitlement under KUSF), a brief review of traditional rate-making analysis must be considered.

In determining a utility's revenue requirement, the Commission must ascertain the company's reasonable and prudent operating costs, its rate base, and a reasonable rate of return. These facts are relevant to allow the public utility the *opportunity* to earn sufficient revenues to cover its reasonable operating expenses. In addition, a public utility

is entitled to earn a return on its "rate base," or its "investment in the plant and property 'used and required to be used' in supplying the [regulated] service." *Kansas Gas & Electric Co.*, 239 Kan. at 501. As a result, the utility earns a return on its rate base by determining an appropriate "rate of return" that is multiplied by the value of the company's rate base. The numerical figure is then added to the company's prudent operating costs to determine the final revenue requirement of the regulated entity. A regulated company is entitled to a return on its equity in order to provide the company with the opportunity to earn enough to pay its shareholders a sufficient return on their investment to retain and attract investors on reasonable terms. *Southwestern Bell Tel. Co.*, 192 Kan. at 76.

The rate of return, which is multiplied against the utility's rate base, is generally calculated based on the company's "cost of capital." The Commission examines the company's capital structure to identify the sources of its capital, including long-term debt, preferred stock, and common stock. The cost of each of these items of capital is determined. Usually, the cost of common stock (*i.e.*, dividends) is the highest and the cost of debt is the lowest. *South Central Bell Telephone Co. v. La. Public Service Comm'n*, 352 So. 2d 964, 970 (La. 1977), *cert. denied* 437 U.S. 911 (1978).

Because the "rate of return" element is a multiplier, the capital structure of a company significantly impacts on its revenue requirement. When a capital structure is considered unbalanced, issues arise. A utility heavy in equity as opposed to debt increases the company's revenue requirement under the standard formula because (1) investors demand higher returns than lenders, resulting in equity capital being more costly; and (2) interest paid on debt is deductible by the company for tax purposes, whereas dividends are not. See *Gulf States Utilities v. PSC*, 578 So. 2d 71, 102 n.30 (La.), *cert. denied* 502 U.S. 1004 (1991); *In re Zia Natural Gas Co.*, 128 N.M. 728, 731, 998 P.2d 564 (2000) (a less-than-efficient capital structure which contain excessive equity is likely to result in higher rates).

Using a hypothetical capital structure when actual structures are unbalanced has been consistently viewed as a legitimate means of balancing the investors' interests with the costs to the utility's customers. See *Gold Canyon Sewer Co. v. Arizona Corp. Com'n*, No. CA-CC 09-0001, 2010 WL 2025198, at *7 (Ariz. App. 2010) (unpublished opinion) (if a company has too much equity in its capital structure, it harms ratepayers); *Entergy Ark., Inc. v. Arkansas Pub. Serv. Comm'n*, 104 Ark. App. 147, 165, 289 S.W.3d 513 (2008) (approving use of hypothetical capital structure when applicant's debt-to-equity ratio was equity-heavy and significantly different from the ratios of comparable companies); *Pine Tree Tel. & Tel. v. Public Util. Com'n*, 631 A.2d 57, 68-69 (Me. 1993); *Big Run Tele. Co. v. Pa. P.U.C.*, 68 Pa. Commw. 296, 302, 449 A.2d 86 (1982) (PUC may use a hypothetical interest expense component to a utility's capital structure when the company showed no compelling business reason to possession of long-term debt).

*The Hypothetical Capital Structure in this Case*

This court has recognized the Commission possesses the power to use a hypothetical capital structure for a regulated utility when calculating an appropriate rate of return. *Kansas Industrial Consumers v. Kansas Corporation Comm'n*, 30 Kan. App. 2d 332, 339, 42 P.3d 110 (2002); see *Sekan Electric Coop. Ass'n v. Kansas Corporation Commission*, 4 Kan. App. 2d 477, 480, 609 P.2d 188 (1980) ("'[T]he owners and management of a utility have the right to determine what the debt-equity ratio should be, but they may not always make the ratepayers foot the bill resulting from the choice.'"). Similarly, the Commission's actions in basing capital structure on other relevant information has been upheld. See *Aquila, Inc.*, 2005 WL 1719705, at *2-3 (upholding Commission's use of parent corporation's aggregated capital structure rather than regulated subsidiary's capital structure); *Wheat State Telephone Co., Inc. v. State Corp. Comm'n*, No. 91,640, 2004 WL 895534, at *2 (Kan. App. 2004) (unpublished opinion) (rejecting use of hypothetical capital structure when parent corporation possessed an unusually high debt portfolio).

26

The Commission observed that RLECs have low-cost debt readily available and that it was reasonable to use low-cost debt financing rather than higher-cost equity financing. According to the Commission, a company which chooses a high equity ratio is not entitled to have ratepayers fund an excessive return on equity above a reasonable utility level. *Wheat State Telephone Co., Inc*., 2004 WL 895534, at *6. In this case, adjusting Moundridge's capital structure to a 40% debt and 60% equity changed the weighted cost of capital from 9.39% to 7.85% (again, a significant difference because it is a multiplier).

Moundridge has debt obligations to the Rural Utilities Service of the United States Department of Agriculture (RUS) that is secured by all of Moundridge's property. Moundridge's president testified that the company would require outside capital if the Commission accepted Staff's recommendations in order to ensure continuing maintenance and improvement of facilities and services for its customers. He testified that Moundridge was currently realizing operating losses and would be unable to meet ongoing costs and secured debt obligations if its KUSF was reduced. However, he failed to explain how the company was precluded from obtaining additional loans from RUS or other sources rather than seeking out new investors.

The Commission's decision is supported by substantial competent evidence and is not arbitrary and capricious. It is not this court's function to weigh the testimony of competing experts as to these complex issues. In KUSF audits, as in traditional utility ratemaking cases, the Commission's decision must give the company a fair *opportunity* to pay its expenses and earn a reasonable return on its investment. At some point, investors must share the burden of decisions made by management. In this case, it was management's decision not to borrow reasonable sums to deploy advanced fiber optics prior to the current time. Moundridge fails to explain this delay or how prior years' FUSF and KUSF funds were inadequate to deploy fiber optics prior to the present time.

*The Commission's order disallowing recovery of certain wage expenses, depreciation expense, and other expenses was not arbitrary and capricious.*

In its order, the Commission accepted various Staff recommendations relating to Moundridge's claimed operating expenses that effectively reduced Moundridge's intrastate operating expenses. Specifically, Staff challenged the (1) management fees Emmental charged to Moundridge as compared to its nonregulated affiliates; (2) the building lease expense charged by KCC Rentals to Moundridge; (3) the computer and office equipment lease expenses Moundridge charged to Mid Kansas Cable; and (4) the billing and collection expenses for customers receiving nonregulated services. Staff also recommended changes to reallocation of General Support Facility (GSF) assets and depreciation between Moundridge and its affiliates.

Moundridge takes issue with these adjustments noting that they were significantly different than Staff's adjustments in Moundridge's 2008 KUSF proceeding (08-MRGT-221-KSF). Moundridge asserts its operations between 2008 and the present were "virtually unchanged." Moundridge asserts that its expense levels are reasonable in comparison to Kansas RLECs and, based on 2013 operating expenses per loop, the company ranked 26th out of 35 companies. The Commission took administrative notice of Moundridge's 2008 audit during the hearing.

*Allocation of Expenses Between Regulated and Nonregulated Entities*

Ann Diggs testified about the FCC's affiliate transaction rules and how regulated companies are required to transfer or sell goods or services based on fair market value (FMV) and fully distributed cost (FDC) to nonregulated affiliates. Because these transactions are not negotiated at arms' length, the FCC recognizes the inherent risk that the regulated operations could be used to subsidize an affiliate's nonregulated operations. See 47 C.F.R. § 32.27(c) (2015). Because the purpose of KUSF is to ensure RLEC

28

customers have access to affordable telephone service, the RLEC's KUSF should not be used for subsidizing nonregulated affiliates.

### a. *General Support Facility Costs*

Staff's witness also found that Moundridge's allocation of General Support Facility (GSF)—including land, buildings, vehicles, and other work equipment—needed adjustment between its regulated operations and nonregulated affiliates. Digg testified that KCC Rentals' building lease expense was greater than warranted by the rules, and the computer and office equipment Mid Kansas Cable leased from Moundridge was not appropriately priced under the standards. As a result of Staff's reallocation, including depreciation related to the GSF, Moundridge's rate base would be reduced by $11,624 on an intrastate basis.

### b. *Payroll Expense*

Staff also recommended adjustments to Moundridge's claimed payroll expense. Although the test year ended December 31, 2013, Staff removed the payroll cost for an employee who had been terminated in 2014 and adjusted the payroll expense to reflect current labor expenses, payroll, and bonuses, in 2014. Staff also compared employee compensation of Emmental and Moundridge employees with a 2014 Survey of Compensation and Benefits report relating to independent telecommunications companies issued by the NTCA. Based upon this comparison, Staff adjusted compensation which exceeded the prevailing rates of pay for similar positions in comparable telephone companies. The NTCA survey compiles data from hundreds of independent telephone companies by region, size, operating revenue, number of access lines, and number of employees. Staff used the NTCA criteria to calculate the average salary and bonuses of Moundridge's employees as compared with those positions with other similar telephone companies. Staff relied on the NTCA survey's reported 75th percentile as the top range of

29

the prevailing rate of pay. In its adjustments, Staff disallowed any Moundridge salary exceeding this 75th percentile.

Among the reasons cited by Staff for using this comparison process, Staff noted there was no independent review or oversight of compensation paid to key management employees because they were the owners and directors of the company. In addition, Moundridge did not reduce salaries or use other cost-cutting measures to limit or reduce discretionary bonuses before seeking an increase of KUSF due to a reported revenue deficiency. Staff also asserted that its reductions of the bonuses were conservative because the NTCA survey include a number of larger companies. Finally, Staff found that paying key management employees in excess of prevailing rates was not necessary to attract and retain qualified employees. Diggs testified that Staff was not interfering with Moundridge's ability to pay above-prevailing-rate salaries or bonuses, but were simply disallowing KUSF payments to include such expenses. These disallowances reduced Moundridge's intrastate expenses by $72,880.

Moundridge's expert testified that Staff's determination of wages allocated to regulated service was arbitrary. Previously, Staff recognized the actual salary Moundridge paid its employees as done in the 2008 docket. During that earlier docket Staff did not disallow any compensation Moundridge allocated to its regulated operations and compared the changes between 2008 and 2013. The witness asserted that Staff allocated an excessive portion of employee compensation to nonregulated operations. He also presented documentation showing that compensation amounts for each employee do not exceed the comparable compensation levels from the survey.

c. *Management Expense*

In its testimony, Staff recommended an adjustment to the management fees Moundridge paid to its parent company, Emmental. Emmental employs four persons,

including Moundridge's President, General Manager, and Office Manager; its fourth employee did not provide services to Moundridge. Staff asserted that the FCC affiliate transaction rules require that fees between affiliates must be recorded by the regulated company at an amount no greater than *the lower of* the fair market value (FMV) or the fully distributed cost (FDC). In determining FDC, the Staff recommended the Commission disallow discretionary profit sharing distributions to management employees made during the test year in addition to salary and bonuses. Because Moundridge was claiming it was operating at a loss, Staff asserted that such discretionary contributions should not be included in KUSF distributions.

Staff also recommended that the directors' fees paid to Moundridge's directors should be disallowed. Staff noted that the directors were paid a fee by Emmental and that fee was passed through to Moundridge due to management's election of its corporate structure. Staff asserted this resulted in a double-layer of director fees which was an unnecessary expense for the regulated company's operations for purposes of calculating KUSF.

Staff also challenged Moundridge's allocation of all but 11.5% of Emmental's management fees to its regulated operations. Staff found that Moundridge's consultants based the allocation of some of the management fees based on "'discussions with Emmental employees'" and asserted the allocation reflected "'the approximate time spent on the respective functions.'" The remaining allocation of management fees were based on the time allocations of other Moundridge employees during 2011; during that year, only 3.34% of management fees were allocated to nonregulated operations. Staff alleged that Moundridge failed to adequately document its allocation of the labor costs of key management employees as it had previously agreed to do in a 2008 settlement agreement, discussed further below. Staff's calculations did not alter the expenses relating to marketing, executive expense or G&A expense, which accounted for 67.5% of management expense. However, Staff allocated the balance of 32.5% of management

31

fees to nonregulated operation because office employees' recorded time was spent on nonregulated business operations. Staff recommended Moundridge immediately implement procedures to follow positive time-reporting procedures in order to ensure proper documentation of regulated versus nonregulated work as required by a prior order. This reallocation of Moundridge's management expenses decreased its intrastate expenses by $235,274.

Moundridge objected to limiting the management expenses allocated to its regulated operations. It objected to Staff's use of a composite time allocation for only the three managers, claiming it should calculate regulated versus nonregulated work time based on the time spent by all 10 employees of the company. This would result in 21.9% of management expenses being allocated to the nonregulated affiliates. This would increase Moundridge's recoverable intrastate operating expenses by $41,817.

d. *Allocation Analysis*

The bulk of Moundridge's arguments relating to plant, payroll, and management expense allocation focus on the Commission's handling of Moundridge's request for additional KUSF support filed in 2008, KCC docket No. 08-MRGT-221-KSF (2008 Docket). Moundridge requested the Commission take notice of this docket, and it did so. Moundridge contends that the Commission's adjustment to these expenses between affiliates and its questions concerning salaries of Moundridge's employees was inconsistent with the position that Staff took in the 2008 Docket.

Ann Diggs testified in the 2008 docket and discussed the same federal regulations regarding the allocation of costs between regulated and nonregulated services. Diggs did recommend various adjustments in the 2008 allocations. Diggs noted that Moundridge's employees' salaries at that time were determined based upon a NTCA wage and benefit

32

study prepared 5 years before. Again, Staff had recommended a decrease in management fees for intrastate operations by over $250,000.

Although Moundridge argues that Staff's recommendations in the 2008 docket vary significantly on these issues from the position Staff took here, it is unclear what weight this court can give those recommendations. The 2008 docket was settled by a Stipulated Settlement Agreement (SSA) in the form of a "black box" settlement. In the SSA, Staff and Moundridge acknowledged they differed on the appropriate amount of additional KUSF Moundridge was entitled to receive but agreed to an annual support amount at a figure between their two calculations. The SSA specifically provided that the "increase shall not be considered to be a compilation of any specific adjustments made by the respective parties, but shall represent a global settlement *wholly apart from any individual adjustments or recommendations made in prefiled testimony*." (Emphasis added.) Hence the term "black box" settlement agreement. The SSA provides that Moundridge had the ability to increase local rates by $2 per line annually until the rates reached the affordable level. Moreover, the parties agreed that Emmental's management employees "will" follow the positive time reporting procedures in the future including directly charging time to nonregulated operations. The Commission approved this black box SSA.

Moundridge fails to make a detailed comparison between the working papers of 2008 and 2014. However, it claims the Commission's variance between the 2008 SSA and its current decision violates the standards of *Home Telephone Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 1002, 76 P.3d 1071 (2003), *rev. denied* 277 Kan. 923 (2004), by unjustifiably deviating from past practices.

Generally, administrative agencies may change positions on an issue if the new position is supported by substantial competent evidence. When an administrative agency deviates from a policy it adopted earlier, however, it must explain the basis for the

33

change. *Home Telephone*, 31 Kan. App. 2d at 1012. "Past practices should not prevent a regulatory agency from adopting in good faith new approaches and techniques in an effort to more realistically determine a rate of return fair to both the utility and the ratepayers." *So. Cent. Bell Tel. v. La. Public Service Com'n*, 352 So. 2d 964, 972 (La. 1977), *cert. denied* 437 U.S. 911 (1978). The agency must simply explain its deviation from past practices.

The decision in *Home Telephone* is clearly distinguishable. In *Home Telephone*, the Commission was conducting a KUSF audit of Home, a Subchapter S corporation and a subsidiary of another Subchapter S corporation. A primary issue in the audit was the appropriate amount to include as income tax expense in Home's operating expenses. Under judicial precedent, a two-step process had been established finding that the appropriate income tax expenses for such a company would be the lesser of (1) the taxes the utility would have paid had it been a Subchapter C corporation, or (2) the actual taxes the shareholders paid on the utility's Subchapter S corporation revenues. See *Greeley Gas Co. v. Kansas Corporation Commission*, 15 Kan. App. 2d 285, 287, 807 P.2d 167 (1991).

During Home's audit, however, the Staff told Home that the Commission consistently relied on only the first prong of the *Greeley Gas* standard: the income tax expense would be based on the taxes that would be due for a Subchapter C corporation. Accordingly, both Staff and the company presented evidence on their separate calculations based on the Subchapter C corporation scenario. As a result, none of the prehearing discovery or prefiled testimony addressed the question of the second prong of *Greeley Gas*: the shareholders' actual tax liability. *Home Telephone*, 31 Kan. App. 2d at 1005-07. Neither during the evidentiary hearing nor in its initial order did the Commission refer to the lack of evidence of the second prong of the test. Instead, the Commission issued an interim order that gave the Staff and Home 90 more days to resolve their calculations on the income tax issue. Home later accepted the staff's final calculations of the Subchapter C corporation taxes. The Commission, thereafter, rejected

any income tax expense asserting for the first time that no evidence had been presented as to the actual shareholder's tax liability. The Commission, however, failed to explain why it deviated from its previous practice of using only the Subchapter C corporation tax calculations. 31 Kan. App. 2d at 1008-09. Because of the Commission's deviance from its past practice and belated adverse action without notice, this court found the Commission's actions arbitrary and capricious. 31 Kan. App. 2d at 1011.

Based upon the facts of this case, however, the Commission's decision was not arbitrary and capricious. First, the Commission relied on Staff's comparison of Moundridge's salaries with a recent NTCA survey. Moundridge had used a similar survey (which was 5 years old) in justifying its salaries to employees in 2008. Staff took issue with Emmental's management fees allocated to Moundridge in 2008, just as they did in the current proceeding. In fact, as a result of the SSA in 2008, it was explicitly agreed that management personnel would use positive time reporting procedures to ensure accuracy in allocating its fees between regulated and nonregulated affiliates. There is no dispute that Emmental's management personnel failed to comply with this agreement and now dispute the Commission's allocation decision. Based upon the shared facilities, managers and employees of Moundridge and its affiliates, we find the Commission's decision is supported by substantial competent evidence and is not arbitrary or capricious.

*Depreciation Expenses*

Staff witness Katie Figgs recommended in her prefiled testimony that the Commission decrease Moundridge's depreciation expense by over $300,000 on an intrastate basis. She testified that Staff calculated depreciation expense on a going-forward basis based upon the plant account balances of its depreciable assets. She testified that the adjustment might change if there were any changes in the "plant in service" and accumulated depreciation balances.

35

During the hearing, Figgs agreed that Staff's amended depreciation schedules were based on Moundridge's depreciation expense based on the actual book balance of the plant as of September 30, 2014. Some of Moundridge's book accounts would have been fully depreciated by September 2014. However, in decreasing the company's depreciation expense, she did not include any potential increases in capital assets in those accounts nor did her calculations include any actual investments made by the Company after September 30, 2014, that were known to have been put in place by December 31, 2014. Instead, Figgs relied on what was known and measurable data for the plant, plant service, and accumulated depreciation based upon information from Moundridge that existed as of September 30, 2014. She admitted during the hearing that Moundridge provided Staff with information regarding capital assets additions and retirements that occurred during the entirety of 2014. This document reflected that Moundridge added $11,000 in plant additions and retired about $40,000 in plant services or equipment by the end of 2014.

Moundridge's rebuttal testimony objected to Staff's reduction of annual depreciation expense. Although the test year ended December 31, 2013, Staff adjusted the depreciation expenses for the period ending September 30, 2014, thereby "forecasting" depreciation expense beyond the test period. Moundridge contends that Staff's calculations assumed, without evidence, that there will be no plant additions beyond September 30, 2014. However, Moundridge's expert testified that the company has a telephone plant under construction (TPUC) valued at $226,637 in September 30, 2014, and over $71,000 in TPUC by December 31, 2014. Finally, Moundridge planned additional construction activity in 2015 with projects costing over $550,000. Moundridge opined that if Staff was relying on a going-forward analysis of depreciation expenses, it should consider TPUC. Moundridge provided rebuttal evidence of all TPUC the company believed to be placed into service before August 30, 2015, and claimed a modified depreciation expense of over $875,000. However, it should be noted that as a general rate-making principle, new plant and capital cost assets will not be included in rates until completed and "used and required to be used." *Kansas Industrial Consumers Group, Inc.*

*v. Kansas Corporation Comm'n*, 36 Kan. App. 2d 83, 97, 138 P.2d 338, *rev. denied* 282 Kan. 790 (2006).

In order to avoid speculative calculations in rate-making, the generally accepted practice by regulatory commissions is to determine future rates upon known past and present conditions. Accordingly, the Commission generally relies on data gathered during the test year. Admittedly, this process creates a conflict between "'the need to lend some finality to ratemaking by utilizing a well-defined, finite test period and the need to base calculations upon the latest available relevant data which often pertains to time periods other than the test period.' [Citation omitted.]" *Gas Service Co. v. Kansas Corporation Commission*, 4 Kan. App. 2d 623, 635, 609 P.2d 1157, *rev. denied* 228 Kan. 806 (1980). However, courts have recognized that the Commission, *in its sound discretion*, may give effect to changes that occur outside the test year when those changes are "known and measurable." Claims for future expenses which are merely conjectural, however, are not generally allowed. *Columbus Telephone Co. v. Kansas Corporation Comm'n*, 31 Kan. App. 2d 828, 835, 75 P.3d 257 (2003). New plant expenditures must be "reasonably certain to occur" and the rate adjustments for them "determinable." *Commonwealth Edison Co. v Illinois Commerce Comm'n*, 2013 IL. App. (2d) 120334, ¶ 83, 997 N.E.2d 762.

Determining an appropriate depreciation expense is a complex issue in any rate case and inherently involves speculation to the degree it requires projection of future events. See *Western Resources, Inc.*, 30 Kan. App. 2d at 368-73. However, the need to project future events is not license for the Commission to engage in unchecked speculation. The effect of the Commission's order must follow the general principle that changes in rates due to future or nontest year events be, at least to some degree, known and measurable. See *Kansas Industrial Consumers*, 30 Kan. App. 2d at 343. The Commission has discretion to include in rate calculations any costs and revenues not part

of the test year if the changes are known and measurable. *Western Resources, Inc.*, 30 Kan. App. 2d at 353.

Determining appropriate depreciation expenses is an intricate process in that it involves determining the actual value of capital assets, determining the life of assets, and deciding an appropriate rate of depreciation. In addition, with most utilities, the investment in new capital assets is a regular occurrence as business expands or existing assets become obsolete or reach the end of their useful life. While a test year is designed to be a snapshot of a company's current financial status, the Commission may make adjustments for costs that are known and measurable. *Kansas Power & Light Co.*, 5 Kan. App. 2d at 519. In its order, the Commission noted that synchronization with depreciation expense is a subject of concern because of efforts by some companies to inflate their test year depreciation based on projected, but yet unfinished, plant balances.

Clearly, Moundridge presented some evidence, known and measurable, of minimal new plant assets completed as of December 31, 2014, as well as a spreadsheet reflecting the cost of anticipated projects for the coming year. However, it is not clear to this court when the projects under construction would completed, the actual nature of the anticipated projects, or how the cost of such capital projects would be allocated between Moundridge and any of its affiliates. It was not an abuse of discretion for the Commission to give no weight to a spreadsheet containing only numbers, with no written project plans, requests for bids, or draft construction contracts for anticipated plant construction in the high six-figure range Moundridge claimed it would be completing. In light of the record before this court, we cannot say the Commission's decision on depreciation was arbitrary and capricious.

*Income Tax Expenses*

Moundridge further takes issue with the Commission's modification of income tax expenses by reducing the state income tax from the agreed rate of 4.82% to 0%. Moundridge argues there was no evidence presented of the 0% tax rate, nor did the Commission take administrative notice of the tax statutes. Accordingly, the company argues there was not substantial competent evidence in the record to support the Commission's decision on this point.

Staff presented testimony about the Commission's long-term practice in calculating the appropriate income tax expenses with respect to Subchapter S corporations. The Commission based its practice on *Greeley Gas Co.*, 15 Kan. App. 2d at 286-87. Under *Greeley*, the utility must determine the income taxes shareholders paid on the income passed-through to them from the Subchapter S corporation; the utility would also calculate the income tax as if the company was a Subchapter C corporation. The Commission would then incorporate the lower of the two calculations as the utility's income tax expense. In Finger's original testimony, she determined that under the *Greeley* standard, the appropriate expense would be based on the lower Subchapter C corporation tax rate. The parties seemed to agree to the state income tax expense of 4.82% prior to the hearing.

During the live testimony, Commissioner Apple asked Staff's witness regarding the impact of changes in the 2014 Kansas tax code as it affected Subchapter S corporations by reducing their state income tax rate to 0%. The Chair of the Commission also inquired about the applicability of the 2014 tax code. The original Commissioner directed Staff to ensure an assessment of the new tax code was considered when calculating the final income tax expense for the proceeding. Moundridge did not object to the Commissioner's statements or the instructions given to Staff. In its posthearing brief, Staff cited to K.S.A. 2014 Supp. 79-32,117(c)(xx)(1) that reduced that State income tax

rate to 0%; Staff accordingly calculated and recommended the Subchapter S corporation tax rates be used as they were lower than Subchapter C corporation taxes. Moundridge objected in its rebuttal brief, asserting the same points it now raises on appeal.

Significantly, Moundridge does not dispute the accuracy of Staff's posthearing state income tax rate determination, nor does it claim it has been prejudiced as it was given the opportunity to respond both at the hearing and in its posthearing brief. Moreover, Commissioner Apple's statements regarding the tax rates and clear direction to Staff to take those rates into account seems comparable to the taking of administrative notice of the tax revisions. Finally, Moundridge does not claim it was unfair to consider the 2014 tax amendments when depreciation and some other expenses were considered based on book values ending in September 2014 (notwithstanding the test year ended December 31, 2013). For these reasons, the Commission's actions are supported by substantial evidence and were not arbitrary and capricious.

*The Commission's order reducing Moundridge's KUSF support to $0 did not violate traditional rate of return regulation and constitute a taking of property without just compensation.*

Moundridge's final two issues are essentially the same point: that the Commission's revenue requirement decision, which resulted in its KUSF contribution being reduced to $0, was so unreasonable to be confiscatory and rose to an unlawful taking of property by the State. Moundridge relies on *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989), and *Power Comm'n v. Hope Gas Co.*, 320 U.S. 591, 64 S. Ct. 281, 88 L. Ed. 333 (1944).

In *Duquesne* and *Hope*, the United States Supreme Court has recognized that the Fifth Amendment of the United States Constitution protects utilities from government regulations that prevent a regulated utility from charging appropriate rates for the use of

40

their property that serves the public; a Fifth Amendment violation occurs when the regulatory agency sets rates that are so unjust to be confiscatory. *Duquesne*, 488 U.S. at 307; see also *Hope*, 320 U.S. at 602 (referring to unjust and unreasonable rates).

The Kansas Supreme Court approved the *Hope* criteria in *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n.*, 239 Kan. 483, 489-91, 720 P.2d 1063 (1986). In *Kansas Gas & Electric Co.*, Kansas Supreme Court described the United States Supreme Court's decision as follows:

> "[T]he *Hope* court emphasized that the focus of inquiry is properly upon the end result or 'total effect' of the rate order, rather than upon the rate-setting method employed. The court described the rate-setting process as a balancing process involving the weighing of certain enumerated interests of the consumer and of the investor. The court stated that the rate-making process involves a balancing of the investor and the consumer interests, and that public utility regulation does not insure that the business shall produce net revenues." 239 Kan. at 489.

Accordingly, if the overall Commission order falls within the "'broad zone of reasonableness'" it cannot be considered confiscatory. 239 Kan. at 489. Similarly, in *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 386 P.2d 515 (1963), the Kansas Supreme Court reiterated:

> "There is an elusive range of reasonableness in calculating a fair rate of return. A court can only concern itself with the question as to whether a rate is so unreasonably low or so unreasonably high as to be unlawful. The in-between point, where the rate is most fair to the utility and its customers, is a matter for the State Corporation Commission's determination." 192 Kan. 39, Syl. ¶ 17.

The Constitution does not require that the end result of a rate decision must set rates that "will, in any given case, guarantee the continued financial integrity of the utility. Rather, *Hope* requires only that the regulatory authority balance competing consumer and

investor interests to determine just and reasonable rates providing a return on used and useful property." *Kansas Gas & Electric Co.*, 239 Kan. at 490.

Because there is substantial competent evidence to support the Commission's various rulings, there is no meaningful basis to conclude that the reduction of Moundridge's KUSF support amounts to an unconstitutional taking of property. The telecommunications industry has, for years, relied on subsidies to exist and prosper. Since 1996, the FCC and states have been moving toward developing competitive markets for telecommunications while ensuring universal service for customers in low income and high cost areas. RLECs must be tasked with providing service with minimal subsidies from the government. Moundridge has failed to prove that the Commission's efforts to balance its needs as a COLR and the interests of the general public and KUSF contributors is arbitrary or capricious, nor has Moundridge established that it is otherwise denied the *opportunity* to earn sufficient revenues to pay its expenses and pay a reasonable return to its investors. It has a continuing responsibility to incur prudent expenses, properly allocate its costs among affiliated nonregulated companies, and act prudently in investing in capital assets.

For all these reasons, we find Moundridge has failed to carry its burden of establishing the Commission's ruling was improper under any provision of the KJRA.

Affirmed.